# IN THE SUPREME COURT OF IOWA

No. 11–1082

Filed August 23, 2013

**STATE OF IOWA,**

Appellee,

vs.

**JONAS DORIAN NEIDERBACH,**

Appellant.

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Arthur E. Gamble, and Artis I. Reis, Judges.

Defendant appeals from his convictions for child endangerment. **AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

Gary D. Dickey Jr. and Angela L. Campbell of Dickey & Campbell Law Firm P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, John P. Sarcone, County Attorney, and Steven M. Foritano, Nan M. Horvat, and Jeffrey K. Noble, Assistant County Attorneys, for appellee.

**WATERMAN, Justice.**

A Polk County jury found Jonas Neiderbach guilty of six counts of child endangerment, and the district court imposed a fifty-year prison sentence. The victim is his son, E.N., who was less than seven weeks old when he suffered a broken arm, fifteen rib fractures, and a permanent brain injury over a three-week period. The victim's mother, Jherica Richardson, pled guilty to child endangerment and is serving a twenty-year prison sentence. Jonas appeals his convictions on numerous grounds. For the reasons that follow, we vacate his convictions as to two counts for the baby's broken ribs because we find the evidence insufficient. We also find the district court erred in denying Jonas's motion for an in camera review of Jherica's mental health records under Iowa Code section 622.10(4) (Supp. 2011), a statute we uphold today as constitutional in *State v. Thompson*, 836 N.W.2d 470, 490 (Iowa 2013). We affirm the district court on all other issues. We remand the case for the district court to perform an in camera review and for further proceedings consistent with this opinion.

### I. Background Facts and Proceedings.

"We recite the facts in the light most favorable to the verdict." *State v. Garcia*, 616 N.W.2d 594, 595 (Iowa 2000). E.N. was born on May 27, 2009. His parents, Jonas and Jherica, were age twenty at that time and living with Jonas's parents, Jon and Mary Neiderbach. Although E.N. was full term and appeared healthy overall, he spent the first four days following his birth in the neonatal intensive care unit (NICU) because his physicians feared he may have aspirated fecal matter in utero. In addition to this potentially life-threatening concern, E.N. was born with the umbilical cord wrapped around his neck, exhibited tremor activity, and did not feed well. E.N. also tested positive for marijuana at

birth, which triggered a notification to the Iowa Department of Human Services (DHS).

The new parents brought baby E.N. home to the Neiderbach residence. In light of the positive marijuana test, DHS provided the family with a visiting nurse who came to the house on a biweekly basis to check on the baby and to answer questions. E.N. was seen by either the visiting nurse or his pediatrician four times during the first two weeks after he left the hospital and appeared healthy at each visit.

On the evening of June 13, E.N. vomited or coughed up a small amount of blood. The next morning, Jonas and Jherica took him to a clinic. The baby was diagnosed with acid reflux and was prescribed Zantac. The visiting nurse came to check in on E.N. three days later, and he appeared normal with the coughing and vomiting of blood resolved.

Five days later, on June 18, E.N. was taken to the hospital again—this time for a broken arm. That morning, Jonas, Jherica, and E.N. returned from Jonas's paper route with the baby asleep. E.N. awakened crying. Jherica handed him to Jonas and left the room to prepare a bottle. She heard the baby's cries escalate to a scream and returned to find E.N. lying on the bed with his right arm above his head and his left arm limp beside him. Jonas stood over the baby. Jonas told Jherica that E.N.'s arm became pinned behind his back as Jonas laid him on the bed and that he had heard a pop. Jherica checked whether E.N. could grasp her finger with his hand and found that he could not.

Jonas and Jherica took E.N. to the emergency room where the attending physician determined that the baby had a spiral fracture of his humerus, the upper arm bone. E.N. was hospitalized overnight to be

examined for other signs of abuse. The hospital reported the injury to DHS.

DHS notified Detective Tim Tyler of the Des Moines Police Department who came to the hospital with two DHS workers to interview the attending physician, Jonas, and Jherica. Jonas repeated the story he had told Jherica and the doctor. Jonas and Jherica were separately instructed that going forward there would be a safety plan in place under which Jonas would not be allowed alone with E.N.

After his discharge from the hospital on June 19, E.N. was seen by his pediatrician, Dr. Eric Andersen. Aside from his broken arm, E.N. appeared to be in good health. He had gained two pounds since his last visit and remained calm during the examination. Dr. Lynn Lindaman, E.N.'s pediatric orthopedic surgeon, saw E.N. again on June 26 for a follow-up appointment for his broken arm. Dr. Lindaman found E.N.'s arm to be healing in good alignment.

E.N. was next seen by a physician on July 8, when Jonas and Jherica rushed him to the hospital after he stopped breathing. That afternoon, Jonas, Jherica, and E.N. had returned home from errands, including visiting Jonas's father and Jherica's mother, Connie Richardson, at work. Jon, Connie, and their coworkers noted E.N. appeared healthy that day. E.N. was sleeping when they returned home; however, he soon awakened crying. Jherica tried to feed the baby, but he was not taking his bottle. Jherica handed E.N. to Jonas while she went outside to smoke a cigarette.

Jherica was outside when she heard E.N.'s crying stop abruptly, within three to five minutes after she had handed the infant to Jonas. As she returned inside, Jonas was walking down the stairs holding E.N. Jonas was crying; E.N. was still. Jonas told Jherica that E.N. had

stopped breathing. Jherica noticed a yellowish substance oozing from E.N.'s mouth. Jherica cleared his mouth as best she could, but the baby did not resume breathing. Jherica called her mother to ask what to do and was told to take E.N. to the hospital. Jherica returned to the living room and saw Jonas shaking E.N. while saying, "Why aren't you f_____ breathing?" Jherica yelled at Jonas to stop and told him that they should take E.N. to the hospital. Jonas initially refused to go to the hospital, mentioning it was the "third time," but Jherica convinced him to go together.

Jonas and Jherica strapped E.N. into his car seat and drove to the emergency room at Blank Children's Hospital. Upon arrival they told Dr. Carlin that E.N. had screamed, started gasping, and then stopped breathing altogether. E.N.'s physicians diagnosed the baby with subdural hematomas on both sides of his brain, fifteen rib fractures (some old and some new), and the broken arm. They also found a hypoxic ischemic injury, which is damage to the brain due to lack of oxygen. Dr. Tracy Ekhardt, E.N.'s pediatric critical care specialist, determined E.N.'s "brain injury was due to a force to his head" and that "[t]he explanation that [she] got from the family was not consistent with the amount of force that would be needed to cause that damage to his head."

E.N. was hospitalized seven weeks and then was transferred to a nursing home for children with special needs, where he spent the next five months. Jherica's sister, Shannon Nelson, and Shannon's husband adopted E.N. in November 2009. E.N. remains unable to move his legs and can only barely move his arms. He can move his head side to side, but cannot hold his head up on his own. E.N. is also unable to communicate verbally, has a feeding tube in his stomach, and a

tracheostomy tube that requires regular suctioning. Doctors expect no significant improvement in E.N.'s condition.

The State's initial trial information, filed August 26, charged Jonas and Jherica with eight counts of child endangerment, in violation of Iowa Code section 726.6 (2009), and one count of multiple acts of child endangerment, in violation of section 726.6A. On January 21, 2010, Jherica reached a plea agreement, under which she pled guilty to child endangerment causing serious injury, child endangerment causing bodily injury, and neglect of a dependent person. The plea colloquy shows she admitted to smoking marijuana with the baby in utero, to leaving E.N. alone with Jonas in violation of the safety plan, and to failing to get medical care for E.N. after being told he had broken ribs. Jherica agreed to testify for the State at Jonas's trial. In exchange, the State agreed to recommend that Jherica receive a total sentence of twenty years in prison.

The State amended its trial information on March 11, to drop Jherica as a codefendant and eliminate one count of child endangerment. The jury trial began May 4, 2011. During trial, the State dismissed two more counts. The balance of the case was submitted to the jury on May 18. On May 20, after two days of deliberation, the jury found Jonas guilty on all six remaining counts. The district court sentenced Jonas to fifty years in prison.

Jonas appealed, and we retained his appeal. Additional facts and procedural history will be provided in the discussion of specific issues below.

**II. Issues Raised on Appeal.**

Jonas raises the following issues on appeal: (1) whether the district court erred by failing to dismiss counts two through six as lesser

included offenses of count one pursuant to Iowa Rule of Criminal Procedure 2.6(1) or by failing to grant his motion to sever those counts; (2) whether the district court violated Jonas's due process rights by refusing to issue a subpoena for Jherica's mental health records sought as exculpatory evidence under *State v. Cashen*, 789 N.W.2d 400 (Iowa 2010), and Iowa Code section 622.10(4) (Supp. 2011); (3) whether Jonas's July 8 statement to Detective Kelly acknowledging he shook the baby should have been suppressed because she interfered with his attorney–father's attempt to represent him; (4) whether the district court abused its discretion by admitting into evidence photographs and video of E.N. taken eighteen months after his injuries; (5) whether the district court erred by allowing expert testimony describing medical studies on shaken-baby injuries with reported confessions by caregivers; (6) whether the district court abused its discretion by limiting the cross-examination of Jherica as to her prior inconsistent statements on mental health treatment; (7) whether the prosecutor misstated expert testimony requiring a new trial; (8) whether the district court erred by submitting the aiding and abetting instruction; (9) whether the weight of the evidence was contrary to the jury's verdicts on counts three and six; and (10) whether the evidence was sufficient to support the convictions on counts four and five.

### III.  Scope of Review.

Our review of motions to dismiss is for correction of errors at law. *In re Det. of Stenzel*, 827 N.W.2d 690, 697 (Iowa 2013).  We review a trial court's denial of a defendant's motion to sever for abuse of discretion. *State v. Elston*, 735 N.W.2d 196, 198 (Iowa 2007).

We review constitutional issues de novo.  *See State v. Pearson*, 804 N.W.2d 260, 265 (Iowa 2011) ("We review de novo a district court's

refusal to suppress statements allegedly made in violation of constitutional safeguards."); *State v. Wells*, 738 N.W.2d 214, 218–19 (Iowa 2007) (reviewing de novo defendant's claim that admission of hearsay testimony violated his Sixth Amendment right to confront a witness against him). Discovery rulings challenged on constitutional grounds are reviewed de novo. *Cashen*, 789 N.W.2d at 405 ("Because the issues in this case rest on constitutional claims involving Cashen's due process right to present a defense, our review is de novo."). Nonconstitutional challenges to discovery rulings are reviewed for abuse of discretion. *Id.* ("Ordinarily, we review discovery orders for an abuse of discretion.").

We review the district court's evidentiary rulings for abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). "Although we generally review the district court's admission of hearsay evidence for errors at law, 'when the basis for admission of hearsay evidence is the expert opinion rule . . . we will employ an abuse of discretion standard.'" *Stenzel*, 827 N.W.2d at 697 (quoting *Kurth v. Iowa Dep't of Transp.*, 628 N.W.2d 1, 5 (Iowa 2001)).

Our review of allegations of prosecutorial misconduct is for abuse of discretion. *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011). We review whether there was sufficient evidence to warrant submission of a jury instruction for correction of errors at law. *See State v. Smith*, 739 N.W.2d 289, 293 (Iowa 2007). We review a district court's ruling as to whether a verdict was contrary to the weight of the evidence for abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003). We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Hearn*, 797 N.W.2d 577, 579 (Iowa 2011).

**IV. Dismissal or Severance of Counts Two Through Six Pursuant to Iowa Rule of Criminal Procedure 2.6(1).**

**A. Motion to Dismiss.** Jonas appeals the district court's denial of his motion to dismiss counts two through six. The State's amended trial information filed April 29, 2011, charged Jonas with these six counts of child endangerment:

> Count 1: Multiple acts of child endangerment in violation of Iowa Code section 726.6A.
>
> Count 2: Child endangerment resulting in a brain injury on July 8, 2009, in violation of Iowa Code section 726.6(1).
>
> Count 3: Child endangerment resulting in a broken arm on June 18, 2009, in violation of Iowa Code section 726.6(1).
>
> Count 4: Child endangerment causing rib fractures from June 17–30, 2009, in violation of Iowa Code section 726.6(1).
>
> Count 5: Child endangerment causing rib fractures from July 1–8, 2009, in violation of Iowa Code section 726.6(1).
>
> Count 6: Child endangerment by willfully depriving a child of health care for fractured ribs between July 2–8, 2009, in violation of Iowa Code section 726.6(1).

Jonas contends the State's trial information violates Iowa Rule of Criminal Procedure 2.6(1), which states:

> Two or more indictable public offenses which arise from the same transaction or occurrence or from two or more transactions or occurrences constituting parts of a common scheme or plan, when alleged and prosecuted contemporaneously, shall be alleged and prosecuted as separate counts in a single complaint, information or indictment, unless, for good cause shown, the trial court in its discretion determines otherwise. Where a public offense carries with it certain lesser included offenses, the latter should not be charged, and it is sufficient to charge that the accused committed the major offense.

Jonas focuses on the last sentence of the rule, which prohibits charging lesser included offenses along with the major offense. Jonas argues the

State's trial information violates this rule because it would be "impossible to commit the greater offense of Child Endangerment under [Iowa Code section] 726.6A . . . without also committing the offenses set forth in Counts 2 through 6." *See State v. McNitt*, 451 N.W.2d 824, 825 (Iowa 1990) ("A lesser offense is necessarily included in the greater offense if the greater offense cannot be committed without also committing the lesser."). The State concedes the child endangerment offenses charged in counts two through six are lesser included offenses of the multiple acts of child endangerment charged in count one. *See State v. Hickman*, 576 N.W.2d 364, 367 n.1 (Iowa 1998).

The district court, however, reached a different conclusion based on its reading of two decisions by our court of appeals: *State v. Flanders*, 546 N.W.2d 221 (Iowa Ct. App. 1996), and *State v. Arends*, No. 03–0420, 2004 WL 1159730 (Iowa Ct. App. May 26, 2004) (unpublished opinion). In *Flanders*, the court of appeals considered whether second-degree sexual abuse was a lesser included offense of first-degree kidnapping. 546 N.W.2d at 224. The defendant had been convicted of one count of second-degree sexual abuse and one count of first-degree kidnapping. *Id.* The court noted that, although sexual abuse *can be* a lesser included offense of kidnapping, it may not be in every case. *Id.* at 224–25. This is because "[t]he lesser-included offense analysis addresses situations where multiple charges apply to a single occurrence. Where the alleged acts occur separately and constitute distinct offenses, there can be no complaint one is a lesser-included offense of the other." *Id.* at 224. Thus, if the State alleged the "defendant had committed at least two separate and distinct acts of sexual abuse, and only one of those acts formed the basis for the kidnapping charge," then only one of the sexual

abuse charges would be a lesser included offense of the kidnapping charge. *Id.* at 225.

The district court seized on this language and *Arends*, which the district court interpreted to hold that "where defendant was charged with Multiple Acts of Child Endangerment and supporting evidence is presented that a child was injured on at least three separate occasions, the lesser included analysis does not apply." The district court, however, misapprehended the holding of *Arends*. The *Arends* court did not consider whether individual child endangerment counts are lesser included offenses of a charge of multiple acts of child endangerment; rather, that court considered whether "the crime of child endangerment is a lesser included offense of involuntary manslaughter." 2004 WL 1159730, at *5.

We agree that "[t]he lesser-included offense analysis addresses situations where multiple charges apply to a single occurrence. Where the alleged acts occur separately and constitute distinct offenses, there can be no complaint one is a lesser-included offense of the other." *Flanders*, 546 N.W.2d at 224. In the present case, however, the major offense and the lesser included offenses involve overlapping acts.

Section 726.6A provides that a person is guilty of a class "B" felony if that person

> *engages in a course of conduct including three or more acts of child endangerment as defined in section 726.6* within a period of twelve months involving the same child . . . , where one or more of the acts results in a serious injury to the child . . . or results in a skeletal injury to a child under the age of four years . . . .

Iowa Code § 726.6A (2009) (emphasis added). Thus, one element of this offense requires the State to prove the defendant committed three or more acts of child endangerment under section 726.6. Although the

three or more acts supporting a section 726.6A charge "must be separated by time and place so that each incident is separate and distinct," *State v. Yeo,* 659 N.W.2d 544, 550 (Iowa 2003), the individual child endangerment offenses are not also separate and distinct from the multiple-acts offense.

For example, imagine a scenario in which the state charges a defendant with one count of multiple acts of child endangerment and three counts of child endangerment causing a broken arm, broken leg, and a brain injury.[1] The state proves the acts causing the broken arm, broken leg, and brain injury were "separated by time and place so that each incident is separate and distinct." Although the three lesser offenses are separate and distinct from each other, that does not mean that they are separate and distinct from the multiple-acts offense they support. They, in fact, are not. Under this hypothetical, the state could not prove the defendant committed multiple acts of child endangerment without also proving the defendant committed each of the three counts of child endangerment. *See McNitt,* 451 N.W.2d at 825 ("A lesser offense is necessarily included in the greater offense if the greater offense cannot be committed without also committing the lesser."). The same is true in this case.[2] Accordingly, the individual counts of child endangerment

---

[1]For the sake of simplicity, we assume the state also meets the other requirements of section 726.6A.

[2]Although it is true that the State was not required to prove Jonas committed all five of the individual counts of child endangerment to prove he committed multiple acts of child endangerment, we do not believe the analysis should differ simply because this case involved more than three charges of child endangerment under section 726.6. *See* Iowa Code § 726.6A (noting it applies when "[a] person . . . engages in a course of conduct including *three or more* acts of child endangerment as defined in section 726.6 within a period of twelve months" (emphasis added)).

alleged in counts two through six are lesser included offenses of the first count's charge of multiple acts of child endangerment.

Thus, applying the last sentence of rule 2.6(1), the five lesser included offenses alleged in counts two through six should not have been charged because "it [was] sufficient to charge that the accused committed the major offense." *See* Iowa R. Crim. P. 2.6(3). In any event, the district court would be required "to instruct the jury, not only as to the public offense charged but as to all lesser offenses of which the accused might be found guilty under the indictment and upon the evidence adduced." *Id.* r. 2.6(3).

The State contends to require it to charge a defendant with only the multiple acts of child endangerment would be "cumbersome, confusing, and of no practical value" because

> [the court] would have had to instruct the jurors to consider Neiderbach's guilt under Count 1—which would require instructions on all the underlying offenses, and would also require jury findings concerning all those offenses. Further, the court would have had to instruct that, if the jurors acquitted Neiderbach under Count 1, they should determine Neiderbach's guilt of the underlying offenses—which would require the jurors to reconsider issues they already decided.

We fail to see how these practical considerations differ from any other circumstance when a defendant is charged with a major offense and is instructed on lesser included offenses. Taking this case as an example, on count two Jonas was charged with child endangerment causing serious injury in violation of Iowa Code section 726.6(5). The jury was also instructed under count two as to two lesser included offenses—child endangerment causing bodily injury in violation of Iowa Code section 726.6(6) and child endangerment in violation of Iowa Code section 726.6(7). These lesser included offenses would have required the jury to reconsider issues it had already decided in determining whether Jonas

was guilty of the major offense—for example, whether he caused E.N.'s injury. This interpretation gives effect to all of the language in rule 2.6(1). Accordingly, we hold the district court erred in not dismissing counts two through six of the trial information as lesser included offenses. Only the major offense under section 726.6A should be charged.

We now turn to consider whether this error prejudiced the defendant. "When a nonconstitutional error is claimed, as in this case, the test is whether the rights of the objecting party have been 'injuriously affected by the error' or whether the party has 'suffered a miscarriage of justice.'" *State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008) (quoting *State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004)). This case involves multiplicity, which is "the charging of a single offense in more than one count." *United States v. Langford*, 946 F.2d 798, 802 (11th Cir. 1991). Two concerns arise from multiplicitous counts: "First, the defendant may receive multiple sentences for the same offense. Second, a multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has committed several crimes—not one." *Id.* In *Langford*, the Eleventh Circuit held a defendant had been charged with multiplicitous counts. *Id.* at 804. The defendant argued the three counts should be reversed because they had "improperly prejudiced the jury by suggesting that the defendant committed not one but several crimes." *Id.* The court, however, emphasized that "[t]he principal danger . . . is . . . that the defendant may receive multiple sentences for a single offense." *Id.* Significantly, the Eleventh Circuit held the defendant had not been prejudiced by the multiplicitous indictment, even though he had actually received sentences on all three counts because those sentences were to run concurrently. *Id.* at 804–05.

We agree that the primary risk of prejudice arising from a multiplicitous indictment is that a defendant could receive multiple sentences for a single offense. In this case, however, no such prejudice resulted because the district court merged his convictions on counts two through six into count one and sentenced him on that one count. Jonas was found guilty of separate acts that were chargeable as separate crimes under section 726.6, but when combined, also violated section 726.6A. Under these circumstances, there was no unfair appearance that he had committed "not one but several crimes." Accordingly, we hold Jonas was not prejudiced.

**B. Motion to Sever.** Jonas also appeals the district court's denial of his motion to sever counts two through six. All the counts involved the same victim and acts occurring within several weeks. A defendant in some circumstances may be entitled to a severance to avoid prejudice from the jury hearing evidence inadmissible on one count coming in to prove another count. That is not the situation here. Count one, which includes counts two through six as lesser included offenses, could not be severed. The State was entitled to offer evidence on each act to prove the multiple-acts crime in count one. Accordingly, we hold the district court did not abuse its discretion in denying Jonas's motion to sever.

**V. The Request for Jherica's Mental Health Records.**

**A. Applicability of Section 622.10(4).** On July 20, 2010, Jonas filed a motion to compel production of Jherica's mental health records under the protocol set forth in *Cashen.* The district court denied Jonas's motion on the grounds that *Cashen* only applies when the defendant requests the mental health records of the victim, is claiming self-defense, and is inapplicable to efforts to obtain a codefendant's mental health records. During the pretrial proceedings in this case, the legislature

passed Senate File 291, which took effect upon its enactment on March 30, 2011. *See* 2011 Iowa Acts ch. 8. Senate File 291 amended section 622.10 by adding the following subsection:

> 4. *a.* Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:
>
> (1) The privilege holder voluntarily waives the confidentiality privilege.
>
> (2)(a) The defendant seeking access to privileged records under this section files a motion demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case. Such a motion shall be filed not later than forty days after arraignment under seal of the court. Failure of the defendant to timely file such a motion constitutes a waiver of the right to seek access to privileged records under this section, but the court, for good cause shown, may grant relief from such waiver.
>
> (b) Upon a showing of a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records.
>
> (c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.
>
> (d) Upon the court's determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interests of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information. The court's order shall also prohibit any further dissemination of the information to any person, other than the defendant, the defendant's attorney, and the prosecutor, unless otherwise authorized by the court.

> *b.* Privileged information obtained by any means other than as provided in paragraph "*a*" shall not be admissible in any criminal action.

Iowa Code § 622.10(4) (Supp. 2011).

Jonas renewed his motion seeking Jherica's mental health records pursuant to the procedure set forth in the statute. The renewed motion included the same offer of proof contained in Jonas's original motion for production under the *Cashen* protocol; however, Jonas later supplemented his offer of proof on April 25. The district court again denied Jonas's motion.

On appeal, Jonas argues section 622.10(4) is unconstitutional because *Cashen* set the constitutional floor for requests of mental health records. In *Thompson,* 836 N.W.2d at 482, decided today, we reject a facial challenge to the constitutionality of section 622.10(4) and hold the statute supersedes the *Cashen* protocol. We note that, if Jonas's right to exculpatory evidence trumped the statutory procedure protecting privileged mental health records, as he claims, the same logic would allow Jonas access to Jherica's privileged communications with her lawyer to see if she admitted guilt in a way that could help establish his innocence. Yet, courts would not allow a codefendant to pierce the attorney–client privilege of another defendant to look for exculpatory evidence. *Cf. Wemark v. State,* 602 N.W.2d 810, 815–16 (Iowa 1999) (discussing attorney–client privilege in the context of criminal cases, including the general prohibition on the disclosure of client's confidential communications). Clearly, the legislature is entitled to protect communications between attorneys and clients, just as it may impose procedures governing the disclosure of other records privileged under section 622.10. These privileges serve important purposes that foster and protect necessarily confidential communications. *See id.* at 815

(noting justification of attorney–client privilege is to encourage "unrestrained communication by clients"); *see also McMaster v. Iowa Bd. of Psychology Exam'rs*, 509 N.W.2d 754, 758–59 (Iowa 1993) (discussing same purpose for psychotherapist–patient privilege). Accordingly, although *Thompson* involved the *victim's* mental health records and Jherica is a codefendant, we reject Jonas's constitutional challenge for the same reasons expressed in that opinion. *See Thompson*, 836 N.W.2d at 481.

Furthermore, because this amendment to the statutory privilege found in section 622.10 is procedural, it applies retroactively. *See State v. Godfrey*, 775 N.W.2d 723, 724 (Iowa 2009) (per curiam); *State ex rel. Leas*, 303 N.W.2d 414, 419–20 (Iowa 1981) (applying amendment to statutory physician–patient privilege retroactively as procedural and rejecting argument that amendment changed defendant's substantive rights in manner precluding retrospective application). In *Godfrey*, the district court ordered the state to disclose the home addresses of its witnesses in a criminal proceeding. 775 N.W.2d at 724. We granted the state's application for discretionary review of the pretrial order and transferred the case to the court of appeals, which affirmed the order. *Id.* We then granted the state's application for further review, but before deciding the appeal, we adopted Iowa Rule of Criminal Procedure 2.11(12), which governs disclosure of trial witnesses. *Id.* We noted:

> The new provisions do not relate to the substantive elements of the crimes charged, but pertain only to the procedure for adjudicating the criminal charges leveled against a defendant. Consequently, the amendment is applied retrospectively and resolves the dispute raised on appeal.

*Id.* Similarly, the 2011 amendment to section 622.10 did not change the substantive elements of the criminal charges against Jonas, but rather

altered the procedure for seeking records privileged under section 622.10. Although the amendment was enacted after the first ruling denying Jonas access to Jherica's records, we hold the statute applies retroactively and governs our review of that ruling as well as the subsequent ruling. *See id.*

Thus, we now turn to consider whether the district court correctly applied the statute in this case.

**B. Application of Section 622.10(4).** Jonas argued Jherica's postarrest behavior provided grounds to compel access to her mental health records. This behavior included her emotionless call to a funeral home to report her son had died and inquire about prices, flashing her breasts in jail, and suggesting she should be in a "psych ward" in July 2009. Jonas also argued his access to her records was supported by her history of smoking marijuana during her pregnancy, her demonstrated pattern of dishonesty, and her admitted frustration while taking care of her newborn son. The State and Jherica resisted.

On April 28, the day after an unreported hearing, the district court denied Jonas's motion in a ruling filed under seal. The court found that though Jonas had "demonstrated the *possibility* that [Jherica]'s mental health records contain exculpatory evidence, the defendant has not demonstrated a reasonable *probability* that they contain exculpatory information." The district court noted that because Jherica's records were "very time and situation limited" they were unlikely to contain exculpatory evidence. Jherica was first diagnosed with depression in her early teens and then was diagnosed again at the jail after E.N.'s injuries. The district court rejected as unpersuasive "the statements, incidents and behaviors" defendant identified in support of his contention that the records would contain exculpatory evidence. The district court also

refused to allow defendant to access the records on the basis that there was a "mere possibility that [Jherica] said something to a mental health professional that inculpates herself and exculpates the defendant." On this point, the court observed, "If that were a ground for permitting disclosure, it would have to be allowed in every case. Clearly, that is not what the legislature intended."

The district court identified two circumstances particular to this case that lead it to this conclusion: "the defendant already knows much about [Jherica]" and "had access to [her] pre-incarceration medical records." Finally, the district court concluded Jonas had not established a compelling need for the mental health records because he "already ha[d] information suggesting reasons why [Jherica] might harm the baby and that could suggest she was trying to keep such harm a secret."

The district court specifically found that Jonas had failed to establish the information sought was not available from any other source:

> [G]iven the importance of the privacy interest that is at stake here, and the fact that the statute specifically places the burden on the defendant to show that there is no other source for the information sought, the court does not believe that a defendant is allowed under the statute to obtain another person's mental health records without first exhausting every other source from which there is a reasonable possibility that the same information could be obtained. At least in this case, *there is a reasonable possibility that the defendant could obtain the information he seeks merely by deposing [Jherica].* And, even if he cannot do that, there is an equally strong possibility, given the circumstances just discussed, that by taking the deposition he would at least be able to make a stronger case for obtaining her mental health records under the requirements of SF 291.

(Emphasis added.)

On our de novo review, we find the district court erred in failing to conduct an in camera inspection of Jherica's mental health records. Jherica was a codefendant charged with endangering the same victim, baby E.N. Her credibility was a central issue in the case. Her testimony put E.N. in Jonas's arms when the baby stopped breathing. She and Jonas concocted matching stories to tell at the hospital, giving a version of what happened that was at odds with the baby's life-threatening injuries. Jherica also gave inconsistent statements contradicted by her trial testimony. Significantly, she behaved strangely in jail, by stating she should be in "a psych ward," baring her breasts, and falsely saying her son was dead while asking, without emotion, about burial costs. She pled guilty to three counts of child endangerment, albeit without admitting to personally inflicting the baby's injuries. Jonas's defense strategy included raising reasonable doubt whether certain injuries may have been inflicted by Jherica instead of him. The district court made no finding that Jonas's motion was made in bad faith to intimidate or deter her testimony or for any other improper reason. We conclude Jonas "demonstrate[d] in good faith a reasonable probability that the information sought [in Jherica's records] is likely to contain exculpatory evidence . . . and for which there is a compelling need for [Jonas] to present a defense" within the meaning of section 622.10(4)(*a*)(2)(a).

The district court denied his motion in part because it found Jonas failed to show that "the information is not available from any other source," as required under the statute. Iowa Code § 622.10(4)(*a*)(2)(a). Specifically, the district court found Jonas failed to meet this requirement because he failed to depose Jherica. Under the circumstances of this case, we disagree that his failure to depose Jherica was fatal to his motion to obtain her mental health records. Jherica may

have made admissions to a mental health counselor that she would forget or deny in an adversarial interrogation. Statements memorialized by a neutral therapist would likely be more credible than Jherica's self-serving assertions as a hostile witness. Indeed, noted commentators have recognized that "[e]ven the taking of a deposition from a hostile witness may not provide the substantial equivalent of the information the witness has given to a party to whom he or she is not hostile." Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, 8 *Federal Practice and Procedure* § 2025, at 544 & n.23 (3d ed. 2010) (citing Fed. R. Civ. P. 26(b)(3) advisory committee's note). Her records may very well have enabled defense counsel to more effectively cross-examine her at trial or assisted counsel's preparation for her deposition.

Accordingly, we reverse the district court's ruling denying Jonas's motion for an in camera review of Jherica's mental health records and remand the case for the district court to conduct that review pursuant to section 622.10(4)(*a*)(2). If the district court finds no exculpatory evidence on that review, Jonas's remaining convictions shall remain affirmed. If exculpatory evidence is found, the district court shall proceed as directed in section 622.10(4)(*a*)(2)(c) and (d) and determine whether Jonas is entitled to a new trial.[3]

---

[3]This multistep procedure is similar to that prescribed in cases remanded for in camera reviews to determine whether exculpatory evidence was withheld in violation of the disclosure requirements in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). For example, in *State v. Johnson*, we concluded the district court erred by denying defendant's motion to produce a list of names of those who witnessed the alleged crime and their statements. 272 N.W.2d 480, 485 (Iowa 1978). We remanded for an in camera review and directed that "[i]f it is found that exculpatory material was withheld from the defendant, then a new trial shall be granted. If not, the judgment shall stand affirmed." *Id.* (citing prior Iowa cases using this procedure). The United States Supreme Court also has directed such a procedure in the *Brady* rule context. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 58, 107 S. Ct. 989, 1002, 94 L. Ed. 2d 40, 58 (1987). The *Ritchie* Court held the defendant was entitled to have the

**VI. Defendant's July 8 Statements to Detective Kelly.**

**A. Facts and Procedural Background.** Late in the evening on July 8, the hospital notified Detective Lori Kelly of the Des Moines Police Department that a baby had been brought in with a brain injury. When Detective Kelly arrived at the hospital, she learned that the victim, E.N., "was in very serious condition and may not make it." Detective Kelly interviewed four people that night: Jon, Mary, Jherica, and Jonas, in that order. Greg Sweem, a DHS on-call worker, and Sergeant Lori Neely were present during all of the interviews.

After Detective Kelly finished interviewing Jherica sometime around 2 a.m., she asked Jonas to join her in a private room for an interview. Jonas agreed and walked towards the room. Jon interjected, "I'm not comfortable with my son, Jonas, being interviewed." He asked to be present during his son's interview and told Detective Kelly, "I'm acting as his attorney." Detective Kelly asked Jon whether he was licensed to practice law in Iowa, and he confirmed that he was. Detective Kelly told Jon it would not be possible for him to sit in on the interview because he was a witness. But, she "told both Jon and Jonas that, of course, [Jonas] was welcome to have any attorney that he wanted . . . 'any attorney in the world except for Jon Neiderbach.'" Jonas said nothing during that exchange.

_____

trial court conduct an in camera review of the victim's counseling records possessed by a state agency. *Id.* On remand, the defendant was to receive a new trial if the records "contain[] information that probably would have changed the outcome of his trial." *Id.* Conversely, if the records "contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction [previously vacated by the state appellate court]." *Id.*; *see also State v. Garcia*, 302 P.3d 111, 121 (N.M. Ct. App. 2013) (citing *Ritchie* in remand for trial court's in camera review of victim's mental health records, with new trial to be granted only upon determination that defendant had been prejudiced by improper exclusion of the records in first trial).

Jon repeated that "he was not comfortable with Jonas being interviewed at 2:00 in the morning." Detective Kelly explained she only planned to ask Jonas the same questions she had asked him, his wife, and Jherica. Detective Kelly then looked directly at Jonas and said, "It's up to you whether you speak with us or not. It's your decision." At that time, Detective Kelly noted she had "made it clear that his father was not going to be present [for the interview]." Jonas "said he was willing to speak with [them] and followed [them] into the room."

The interview ended about thirty minutes later when Jon barged into the room, "saying that that was enough, that [they] didn't need to ask any other questions." At that time, Detective Kelly and Jonas were discussing whether Jonas had ever shaken E.N., "even if it was an attempt to get him to get his attention or to get him to breathe after he had gone limp . . . ." Significantly, Jonas had just answered affirmatively when his father entered the room to end the interview.

On September 1, 2010, Jonas filed a motion to suppress the statements he made during this interview. Jonas claimed Detective Kelly had violated his right to counsel and that her deception as to whether his father could represent him as an attorney rendered his confession involuntary. The district court held a suppression hearing on October 1. Detective Kelly and Jon testified.

Detective Kelly testified that she denied Jon's request to be present during her interview of Jonas because she considered Jon "a potential suspect, just like everybody else who had been in contact with [E.N.]" Detective Kelly added:

> I knew that was not something that the Court would allow. It was absurd to me that he would be able to represent his son in a case simply because he is also involved. He's a witness. He's a potential suspect.

Detective Kelly explained that she considered Jon to be a suspect at that time because "[t]here were four people who lived with the child, who had several injuries, and experience and research shows that most cases involve the caretakers, and Jon was one of them."

Jonas was not in custody during the interview and was free to leave at any time. No claim is made on appeal that the interview was custodial. Detective Kelly testified that during her interactions with Jonas, he never invoked his right to an attorney or his right to remain silent, and he never asked to end the interview. The interview was not recorded.

Although Jon admitted that he had not been formally retained as an attorney by his son, Jon testified that approximately two and one-half years prior he had represented his son in a criminal matter. Jon also testified that he had recently given Jonas legal advice during the investigation of E.N.'s broken arm.

The district court denied Jonas's motion to suppress on October 18:

> Detective Kelly correctly informed Jon Neiderbach that he could not act as his son's lawyer during the criminal investigation because Jon was also a suspect, a witness and an employee of the DHS. The Iowa Rules of Professional Conduct prohibit representation where there is a significant risk that the representation will be limited by the personal interest of the attorney. Iowa R. of Prof'l Conduct § 32:1.7(a)(2); *see also* Iowa R. of Prof'l Conduct § 32:3.7 (stating the general prohibition against being an advocate at a trial when the lawyer is likely to be a necessary witness). Jon had a clear conflict of interest as a potential suspect and witness in the case. Since he had not been ruled out as a suspect, Detective Kelly properly determined he could not sit in on the interview of another suspect in the same case.

The district court also found that Detective Kelly informed Jonas that it was his choice whether to speak with her. The district court concluded

Jonas "knowingly, voluntarily and intentionally waived his right to remain silent." The district court also ruled Detective Kelly had not violated Jonas's right to counsel because that right could only be invoked by Jonas, and thus, "Jon Neiderbach had no standing to assert these rights on behalf of his adult son." Finally, the district court determined "[t]he police did not knowingly or intentionally frustrate the defendant's opportunity to meet with an attorney before or during the non-custodial interview at the hospital."

**B. Analysis.** Upon our de novo review of the record, we conclude the district court correctly found Jonas's statement to Detective Kelly was voluntary and that he waived any right to counsel he may have had. Jon was not the right lawyer for his son the night of July 8, 2009. Jon was a witness as one of four adults residing in the home where his grandson, E.N., had been injured repeatedly in recent weeks and that very day. Jon was also a suspect at this initial stage of the investigation. So, too, was Jon's wife, Mary, the victim's grandmother. A lawyer who is personally involved as a witness, a closely related family member, and a potential suspect in a matter police are investigating may have conflicting motives to deflect blame. Such a lawyer should not be representing another suspect interviewed by the police. *See* Iowa R. of Prof'l Conduct § 32:1.7(a)(2) ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest [that] . . . exists if . . . there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer."). We need not decide whether Jon was ethically precluded from representing Jonas the night of July 8 because we decide this issue on another ground.

In *Johnson v. Zerbst,* the United States Supreme Court discussed the test for assessing whether a defendant has waived his constitutional right to an attorney:

> "[C]ourts indulge every reasonable presumption against waiver" of fundamental constitutional rights and . . . we "do not presume acquiescence in the loss of fundamental rights." A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 68 L. Ed. 1461, 1466 (1938) (footnotes omitted); *see also State v. Hilpipre,* 242 N.W.2d 306, 309 (Iowa 1976) ("It is well settled an individual may legally waive his or her constitutional rights. But the State must prove by a preponderance of evidence such was knowingly, voluntarily and intelligently done.").

We will first address whether Jonas acted voluntarily in waiving his right to counsel and giving the interview. In *State v. Madsen,* we applied the totality-of-the-circumstances test to determine whether statements defendant made during a noncustodial interview were voluntary. 813 N.W.2d 714, 722–23 (Iowa 2012). Under this test, "statements are voluntary if the defendant's will is not overborne or his capacity for self-determination is not critically impaired." *Id.* at 722. The factors to be considered in determining whether defendant's statements were voluntary include:

> "[D]efendant's age; whether defendant had prior experience in the criminal justice system; . . . whether deception was used; whether defendant showed an ability to understand the questions and respond; the length of time defendant was detained and interrogated; defendant's physical and emotional reaction to interrogation; whether physical punishment, including deprivation of food and sleep, was used."

*Id.* at 722–23 (quoting *State v. Payton*, 481 N.W.2d 325, 328–29 (Iowa 1992)).

At the time of the interview, Jonas, age twenty, was an adult. According to his father's testimony at the suppression hearing, Jonas had some prior experience with the criminal justice system, although the extent of that experience is not contained within the record. Jonas does not allege Detective Kelly used any deception in taking his statement. Detective Kelly told Jonas he could have "any attorney in the world except for Jon Neiderbach." Jonas never requested any lawyer, and when told it was his choice whether to give the interview, he chose to proceed.

The interview began at 2 a.m., after Jonas had been at the hospital for about twelve hours under emotionally difficult circumstances with the life of his baby in the balance. Yet, he makes no claim that he was too fatigued to waive any right. The police did not detain him for any period preceding the interview. We conclude that even if Jonas had a right to have Jon represent him that night, Jonas knowingly and voluntarily waived that right and that Jon acquiesced by allowing the interview to proceed without telling Jonas to remain silent or to await the arrival of another lawyer. We also find that Jonas's statement to Detective Kelly was made voluntarily. Detective Kelly specifically told Jonas, "It's up to you whether you speak with us or not. It's your decision." She said that with Jon present. Jonas chose to proceed without counsel. We affirm the district court's ruling denying Jonas's motion to suppress the statement he made to Detective Kelly.

**VII. The January 2011 Video and Photograph.**

**A. Facts and Procedural Background.** Jonas moved in limine to exclude from evidence a nearly five-and-a-half minute video and a

photograph of E.N. taken in January 2011, eighteen months after he sustained the injuries on July 8, 2009. The DVD shows E.N. having his tracheostomy tube cleaned and suctioned. E.N. had several seizures during the video. Jonas argued the video was irrelevant and even if relevant, "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Specifically, Jonas argued "the video is clearly intended to arouse the jury's sense of horror and provide an instinct to punish." His appellate brief describes the video as "heart-wrenching." On April 27, the district court heard argument on the motion in limine. The State argued it intended to offer the video to show "the seriousness of the injuries to [E.N.] and clearly the condition that he was in . . . after [those] injuries."

The court did not rule on the motion before the State sought to admit the photograph and video at trial on May 5. During the State's direct examination of Shannon regarding E.N.'s current health condition, the district court admitted the video and photograph into evidence over defense counsel's renewed objection. The video was played for the jury while Shannon answered questions about it. The prosecution did not mention the video during closing arguments.

**B. Analysis.** We must decide whether the district court abused its discretion by allowing the video and photograph into evidence. *See Huston*, 825 N.W.2d at 536 (noting evidentiary rulings under Iowa Rule of Evidence 5.403 are reviewed for abuse of discretion). Our court has long recognized photographs are not inadmissible simply because they are "gruesome or may tend to create sympathy . . . if there is just reason for their admission." *State v. Hummell*, 228 N.W.2d 77, 83 (Iowa 1975); *accord State v. Coburn*, 315 N.W.2d 742, 746 (Iowa 1982) (affirming ruling allowing into evidence "grisly" photos that were "a fair and

accurate depiction" of the child–victim's condition). "Trial courts have discretion in determining whether the value of pictures as evidence outweighs their grisly nature." *State v. Hickman*, 337 N.W.2d 512, 516 (Iowa 1983); *see also* Iowa R. Evid. 5.403.

We disagree with Jonas's contention that the January 2011 video and photograph were irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. The State charged Jonas with child endangerment causing serious injury for the brain injury E.N. sustained on July 8. The State was required to prove beyond a reasonable doubt that E.N. suffered a "serious injury." *See* Iowa Code § 726.6(1), (5) (2009). Iowa Code section 702.18 defines a "serious injury," in part, as a "[b]odily injury which . . . [c]auses protracted loss or impairment of the function of any bodily member or organ." *Id.* § 702.18(1)(*b*)(3). Jonas did not stipulate that E.N. suffered a serious injury. The video and photograph depicted E.N.'s condition before trial and reflected the long-term effects of the injuries E.N. had sustained eighteen months earlier. The video and photograph are relevant to the issue of the victim's serious injury.

We next consider whether the video and photograph were nonetheless inadmissible under rule 5.403. *See State v. Henderson*, 696 N.W.2d 5, 10 (Iowa 2005) ("Even relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice."). To determine whether evidence should be excluded under rule 5.403, we apply a two-part test. *Huston*, 825 N.W.2d at 537. "First, we 'consider the probative value of the evidence.' Second, we balance the probative value ' "against the danger of its prejudicial or

wrongful effect upon the triers of fact." ' " *Id.* (quoting *State v. Cromer,* 765 N.W.2d 1, 8 (Iowa 2009)). Evidence is unfairly prejudicial when it

> "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case."

*Henderson,* 696 N.W.2d at 10–11 (quoting *State v. Plaster,* 424 N.W.2d 226, 231 (Iowa 1988)). But, in a sense, all powerful evidence is prejudicial to one side. The key is whether the danger of *unfair* prejudice substantially outweighs the evidence's probative value, as we noted in *Huston*:

> [T]he purpose of all evidence is to sway the fact finder. In child abuse cases, much evidence will be at least somewhat prejudicial. Exclusion is required only when evidence is *unfairly* prejudicial [in a way that] substantially outweighs its probative value. "Unfair prejudice" is the undue tendency to suggest decisions on an improper basis, commonly though not necessarily, an emotional one.

*Huston,* 825 N.W.2d at 537 (citations and internal quotation marks omitted).

The video of E.N. depicted the ongoing care that he needs and the lasting effects of his injuries. Video evidence is highly effective. "Courts of other jurisdictions have dealt with the issue of the prejudicial nature of day-in-the-life videos and have frequently admitted them into evidence." *Eckman v. Moore,* 876 So. 2d 975, 983 (Miss. 2004). Jonas does not claim the video of E.N. is misleading or deceptive or that it inaccurately depicts E.N.'s condition. *See id.* at 984 ("In order for the video to have the least amount of prejudicial value, the video must portray ordinary, day-to-day situations."). Rather, Jonas argues the video was unnecessary and inflamed the jury. The video's impact on the jury results from the nature of E.N.'s condition, which is fairly depicted.

We do not find the video's probative value is substantially outweighed by unfair prejudice. Just as trial courts have discretion to admit into evidence autopsy or crime scene photographs showing a murder victim, even if the cause of the victim's death is undisputed, so too may district courts allow video accurately depicting an injured child's condition, even if other evidence establishes the seriousness of the injury. The prosecution has leeway in what evidence to use to prove injuries, subject to the district court's discretion under rule 5.403.

In *Rodriguez v. State*, the Texas Court of Appeals held video of the victim's current condition was admissible, rejecting the criminal defendant's challenge under Texas Rule of Evidence 403. 352 S.W.3d 548, 555 (Tex. Ct. App. 2011). The appellate court noted the video had "some probative value in showing that [the victim] suffered a serious bodily injury" as was required for the conviction. *Id.* at 553. The court noted the defendant had not stipulated that the victim's injuries were serious. *Id.* Rodriguez, like Jonas, argued the video should have been excluded under rule 403 because medical records and testimony established the requisite serious bodily injury and that the video was cumulative and prejudicial. *Id.* at 554. The *Rodriguez* court disagreed, stating, "Despite the existence of other evidence to document [the victim]'s injuries, the recording communicates that [his] injuries were serious in a non-technical way that is capable of being easily understood by laymen." *Id.* Moreover, the video "reflected no more than what the jury would see" if the victim had appeared in the courtroom. *Id.* at 555. The same is true for the video of E.N.

We hold the district court did not abuse its discretion by allowing into evidence the January 2011 video and photograph of E.N.

**VIII. Expert Testimony on Shaken Baby Studies with Confessions by Caregivers.**

Jonas challenges expert testimony discussing medical journal case studies of documented brain injuries in which caregivers confessed to shaking the infant–victims. Jonas contends the expert testimony violated the Confrontation Clause and rules against hearsay. The testimony of two experts for the State is at issue.

Defense counsel first objected to the testimony of Dr. Wilbur Smith. While explaining the cause of E.N.'s head injuries, Dr. Smith described the historical underpinnings of the acceleration–deceleration theory. One case history discussed a nanny's admission that she thought it was appropriate to violently shake babies. Jonas's counsel objected to the statement as hearsay, which should have been excluded from evidence because he did not "have the opportunity to question the nanny to see if it was a coerced interrogation."

Jonas's counsel later objected to similar testimony from the State's expert, Dr. Carole Jenny. Dr. Jenny described a study that compared injuries suffered by children who were known to have been shaken with the injuries of children whose caregivers denied that they had shaken them. Defense counsel objected to the following testimony from Dr. Jenny:

> Q. Can you talk to us a little about kind of the type of force or what you might expect to see if you were an independent observer watching this event. A. I can say that people who have seen babies being beaten or shaken report it to be extremely disturbing. There are good reports that have been documented, as well as multiple, multiple confessional reports of people who have been involved with abusing children and causing head injury.
>
> It is not something that happens in the course of normal parenting. It is not something that is, you know, holding the baby and patting them on the back. It is a violent act as reported by the people who do it and the people who see it.

MR. DICKEY: Your Honor, I will object. That is hearsay.

THE COURT: Overruled.

Q. Doctor, let me ask you this: Have there been published studies, in fact, in the *American Academy of Pediatrics* dealing or comparing admissions or statements by a perpetrator and the injuries that were seen in those particular cases? A. Yes.

Q. Were those consistent with what those individuals were saying?

MR. DICKEY: Objection, Your Honor. This is hearsay. May I approach?

THE COURT: Yes.

(OFF THE RECORD)

THE COURT: The objection is overruled and for the same reasons that similar objection was overruled last week with the Court, of course, permitting the defendant at the break to make whatever record the defendant thinks is appropriate. Mr. Foritano.

Mr. FORITANO: Thank you, Your Honor.

Q. Dr. Jenny, I am not sure where I left off. Let me ask you this: Have there been studies comparing statements by perpetrators that discuss the violent shaking and/or shaking and impact, that compare the injuries or looked at the injuries suffered by those infants? A. The most recent study was by Adamsbaum. She looked at 189 cases, I believe, that were adjudicated, that had gone through the courts. There were 28 people who admitted to hurting a child. All of them admitted to shaking. Some of them admitted to impacting the baby as well.

They found that when they compared the injuries in the confession cases with the injuries in cases where people who hadn't confessed, that they were comparable, the babies were injured in the same way.

Q. We are talking about that same type of acceleration/deceleration injury? A. Well, yes, the injury result, the subdurals and subarachnoids, the brain damage. It was similar in both groups.

Q. *Those were published in journals typically relied on in the medical field? A. That article was published in the journal called* Pediatrics, *which is the journal of the American Academy of Pediatrics, which is the most prestigious journal in the field of pediatrics in the world.*

(Emphasis added.)   In overruling Jonas's objection to the testimony of

Drs. Jenny and Smith, the district court stated:

> I do not believe that the matters that you are objecting to violate either the hearsay rule or your client's Sixth Amendment rights.  *I do not believe they amount to anything that would be considered testimonial.  They are matters that experts rely on.*
>
> Dr. Smith's testimony is basically the same as [Dr. Jenny's] testimony in terms of how they formed opinions about mechanisms of these injuries and so forth.
>
> You are certainly entitled to ask these witnesses whether it is possible that the underlying information that was relied on, such as confessions of individuals about how they treated a child, whether they considered the reliability of those confessions.  In other words, did anybody consider whether all of these or some of these confessions were coerced or were not voluntary or whatever.
>
> So I do not believe—beyond that, the matters are general in nature.  I mean, they are not testifying about particular incidents that have any relationship to this particular case other than that this is how they studied these type of injuries and their opinions about how they happen.
>
> So I do not believe that this testimony violates, again, either the hearsay rule or your client's Sixth Amendment right.

(Emphasis added.)

We begin our analysis with Iowa Rule of Evidence 5.703, which we

have said allows

> an expert [to] base his or her opinion on facts or data that are not admissible in evidence so long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

*Gacke v. Pork Xtra, L.L.C.,* 684 N.W.2d 168, 182 (Iowa 2004) (quoting

Iowa R. Evid. 5.703).  We recently noted that "rule 5.703 is intended to

give experts appropriate latitude to conduct their work, not to enable

parties to shoehorn otherwise inadmissible evidence into the case."

*Stenzel,* 827 N.W.2d at 705.  Dr. Jenny testified that the Adamsbaum

study was published in the journal *Pediatrics*, which she described as the "most prestigious journal in the field of pediatrics in the world." She identified *Pediatrics* as a journal "typically relied on in the medical field." Significantly, however, she never testified that the facts and data in the Adamsbaum study derived from police interrogations were "of a type reasonably relied upon by experts" in her field, as required under rule 5.703. Iowa R. Evid. 5.703; *accord Stenzel*, 827 N.W.2d at 705 ("Rule 5.703 requires that the facts and data be viewed as reasonably reliable by experts in 'the particular field.'"). Nor does the State claim her testimony regarding the Adamsbaum study was admissible under the learned treatise exception to the hearsay rule. *See* Iowa R. Evid. 5.803(18). Accordingly, we conclude the district court erred by overruling Jonas's hearsay objections to the experts' testimony regarding that study as well as the nanny case study.

Nevertheless, "[w]e only find reversible error when the admission of improper evidence affects a party's substantial rights." *Stenzel*, 827 N.W.2d at 708. " 'The admission of hearsay evidence "is presumed to be prejudicial error unless the contrary is affirmatively established." ' " *Id.* (quoting *Gacke*, 684 N.W.2d at 183). A lack of prejudice may be established when similar information is properly admitted through another expert witness. *See Gacke*, 684 N.W.2d at 183. We find that occurred here.

Dr. Smith testified, without objection, as follows:

Q. Can you tell us what that mechanism [of brain injury] is, and then maybe we can talk a little bit more about the studies? A. Sure. I did also misstate. The doctor was Guthkelch, not Geddes, was involved.

But the—there are a number of studies which have evolved to make it clear that severe acceleration of the head, particularly if it is off axis—in other words, instead of being straight back and forth, the head flops from side to side—

that that can cause a severe brain injury. *Those are mainstream studies which are widely accepted.*

. . . .

There have been a number of studies, including one that we did where we looked at Iowa kids with this problem, and we found about half of the time we could find evidence of an impact, half of the time we couldn't. There probably is some validity to the impact making it even worse, but in my belief you can certainly do it just by straight acceleration/deceleration, shaking the baby with the head off axis.

(Emphasis added.) Dr. Smith thus testified that there are "mainstream studies which are widely accepted" establishing the causation theory that he was advocating. This testimony did not contain any reference to the nanny or the twenty-eight defendants accused of a crime from the Adamsbaum study. Moreover, he testified without objection to a third study—an Iowa study—that showed that impact was not always found in cases involving brain-injured children. Dr. Smith stated that the rapid shaking of a baby's head causes the blood vessels of the brain to rip, causing subdural hemorrhaging. He further testified that when a baby's temporal tip is moved back and forth against the skull, the tissue is injured. Dr. Smith testified that E.N. had both of these types of injuries.

Based upon this record, we conclude that there is no reversible error resulting from the admission of Dr. Jenny's testimony regarding the Adamsbaum study or Dr. Smith's testimony about the nanny case study. The hearsay testimony was brief, and there was ample, properly admitted evidence from which the jury could conclude that impact was not required to inflict brain injuries.

We next address Jonas's Confrontation Clause objection under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. The threshold question in a Confrontation Clause analysis is whether the evidence is "testimonial." *See Crawford v.*

*Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177, 203 (2004). The *Crawford* Court held that a statement given by the defendant's spouse during a police interrogation and read into evidence against him at trial was testimonial. *Id.* at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at 203 ("Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."). The State argues that the anecdotal "confessions" in the Adamsbaum study were simply referenced to support expert opinion testimony, not for the truth of the matters asserted. Jonas argues that the case histories with anecdotal confessions referred to by the State's experts were offered for the "truth" of the proposition that "shaking alone can cause enough force to cause a traumatic brain injury." Because Jonas lacked the opportunity to cross-examine the persons in the underlying case histories who "confessed" to shaking the babies whose injuries were studied, he argues the Confrontation Clause prohibited expert testimony referring to those studies. Jonas relies on concurring and dissenting opinions in *Williams v. Illinois* to support his Confrontation Clause claim. 567 U.S. ___, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012). In *Williams*, four dissenters and Justice Thomas disagreed that the Confrontation Clause had been avoided because the expert's testimony regarding the basis of her opinion was offered for a purpose other than the truth of the matter asserted. *See id.* at ___, 132 S. Ct. at 2256–59, 183 L. Ed. 2d at 129–33 (Thomas, J., concurring); *id.* at ___, 132 S. Ct. at 2268–70, 183 L. Ed. 2d at 142–45 (Kagan, J., dissenting). Because we have concluded above that any error in admitting the testimony regarding the nanny case study or Adamsbaum study was harmless, we need not decide whether the

testimony was offered for its truth or if it would be considered "testimonial" for purposes of the Confrontation Clause.

## IX. The Limitation on Cross-Examination.

During the cross-examination of Jherica, defense counsel asked Jherica whether she was under the care of a physician, psychologist, or psychiatrist while she was in jail. Defense counsel sought to impeach Jherica with an inconsistent statement she made to the judge during her guilty plea. The State objected. After hearing Jonas's offer of proof on the issue, the trial court sustained the State's objection, stating as follows:

> I think the collateralness of it comes in in this sense, that it has only relevance in challenging the witness's credibility. I think there are limits to what you can do in the way of impeaching witnesses to challenge their credibility.
>
> You can't find anything that you could then ask a witness about and then prove that she made an inconsistent statement about it at some time in the past.
>
> . . . .
>
> The suggestion of this question, although you could impeach her with her prior inconsistent statement and her guilty plea, comes too close to suggesting that psychiatric issues are a substantive issue in this case. They aren't.
>
> There has been no foundation laid which would make them an issue. Its probative value, therefore, in—as it reflects on her credibility is outweighed by its potential for prejudice.
>
> . . . .
>
> . . . I think its probative value in challenging her credibility is limited. Its potential for prejudice is great. And I, therefore, am not going to allow it.

We agree and conclude the district court did not abuse its discretion in limiting the cross-examination of Jherica on this collateral issue.

> It is well settled . . . the right to impeach by prior inconsistent statements is not without limit. The subject of

the inconsistent statement, if it is to be admissible, must be material and not collateral to the facts of the case.

*State v. Hill*, 243 N.W.2d 567, 571 (Iowa 1976).

## X. Alleged Prosecutorial Misconduct.

**A. Background Facts and Procedural History.** Jonas's allegation of prosecutorial misconduct relates to his claim that the prosecutor mischaracterized the testimony of one of his expert witnesses, Dr. Francis Blankenberg. Dr. Blankenberg testified, in relevant part, as follows:

> Q. The subdural hematomas and the subarachnoid hematomas are the result of the acceleration and deceleration and the shearing of the bridging veins, right? A. Yes, that is the usual teaching. Yes.
>
> Q. That is the mainstream – A. That is the mainstream opinion, yes.
>
> Q. That is what you observed, right? A. Yes.
>
> Q. When you have that kind of an injury, that sudden deceleration to the brain, that can cause the hypoxic ischemic injury? A. Not necessarily.
>
> Q. But it certainly could, right? A. There is a big debate about whether that actually can occur as an isolated finding.
>
> The central areas of the brain that are in question that were—that suffered a severe hypoxic injury, that is not typical for child abuse, per se. That is very consistent, however, with complete cessation of blood flow or oxygen for a period of four to five minutes.
>
> . . . .
>
> Q. You can certainly get edema from the acceleration/deceleration injuries, right? A. You wouldn't expect pure edema. It would have to be some degree of hemorrhage or intraparenchymal and shear injury which is manifested on MR by hemorrhage. And sometimes CTs can be sensitive enough to pick it up, but MR is more sensitive.
>
> Q. Edema is swelling, right? A. Correct.
>
> Q. You get that with acceleration/deceleration injuries, right? A. No. You have to injure the microvasc, which are in myelin fibers. So you have to disrupt different parts of the brain in order to get "edema." But a lot of it is mostly shearing of white matter and blood vessels inside the

brain that has to be occurring first, and then secondarily you get edema.

. . . .

Q. You were also asked about acceleration/deceleration injuries. You use a couple of terms that I think we need to explain. You used the term mass effect. A. Correct. Let's put it this way: If you have acceleration/deceleration injury—and let's talk about the brain itself, not the surrounding bridging veins. If you have severe acceleration/deceleration injuries, you tear the white matter tracks up along with the white matter, along with the blood vessels on the white matter tracks, that tends to cause hemorrhage. Sometimes the hemorrhages are not easily seen on CT, though a lot of times they are.

But certainly on MR you would see signs of bleeding on the sequences they provided had they had that kind of injury to the brain itself.

. . . .

Q. You also used—and I don't know if I am going to pronounce this correctly—intraparenchymal? A. Intraparenchymal, meaning inside the brain.

Q. *Why would that be indicative of acceleration/deceleration? A. If you had intraparenchymal hemorrhages, where the white matter meets the gray matter is a weak area when you are in that particular motion. That is where you get tearing.*

Q. *Did you observe that on [E.N.]? A. No.*

(Emphasis added.) The alleged misrepresentation occurred first during the State's cross-examination of another of defense counsel's expert witnesses, Dr. Ronald Uscinski:

Q. Would it change your opinion at all if Doctor Blankenberg said on Friday that the injuries to [E.N.] were the result of acceleration/deceleration injuries?

MR. DICKEY: Objection, that's a mischaracterization of Doctor Blankenberg's testimony.

THE COURT: Once again, jurors, you are the judges of the facts. You have to remember what other witnesses said so overruled.

A. And your question is again?

Q. My question is would it change your opinion if Doctor Blankenberg testified on Friday that [E.N.]'s injuries were a result, the subdurals, were a result of an

acceleration/deceleration injury? A. Would it change my opinion? No, it wouldn't change my opinion.

Q. That the subdurals were caused by shearing of the bridging veins. A. Again, it would not change my opinion.

Jonas alleges the prosecutor misrepresented Dr. Blankenberg's testimony again during closing arguments when he said, "Dr. Blankenberg . . . acknowledged that [E.N.]'s injuries were as a result of the acceleration and the deceleration of the brain and causing those bridging veins to sheer." Defense counsel again objected to the State's characterization of Dr. Blankenberg's testimony. The prosecutor then interjected stating, "That is exactly what he said, and you remember." The court interrupted, admonishing the jurors that they "are the judges of the facts . . . [and] of what the witnesses said." The prosecutor then said, "You rely on your memories for what his testimony was. That is what he said was the mechanism for those injuries." Defense counsel did not request a mistrial after the court overruled either of his objections.

**B. Analysis.**

1. *Preservation of error.* We first consider the State's claim that Jonas waived error by failing to request a mistrial after the court overruled his objections. The State relies on two cases: *Krogmann*, 804 N.W.2d 518, and *State v. Dahlstrom*, 224 N.W.2d 443 (Iowa 1974). Both cases are distinguishable because, here, the district court *overruled* the objections by Jonas's counsel, while in *Krogmann* and *Dahlstrom*, the objections were sustained.

In *Krogmann*, we held defendant did not preserve a claim for prosecutorial misconduct when he failed to move for a mistrial after "the district court sustained the objection and the question was withdrawn." 804 N.W.2d at 526. This is because "the district court had no reason to

believe that [the defendant] wanted anything further done with respect to the prosecutor's improper question." *Id.* That rationale does not apply when the defendant's objection is overruled. *Dahlstrom* similarly held error was not preserved when defendant failed to move for a mistrial after the court sustained his objection. 224 N.W.2d at 449. We noted that "it is the duty of the party aggrieved to timely voice objection to give the trial court opportunity to rule on the matter since [it] occupies a position of vantage and [its] conclusion is entitled to much weight." *Id.* That duty is satisfied by the objection. A motion for a mistrial would be futile when the district court has overruled the objection to the statements giving rise to the grounds for a mistrial.

Our court has previously held that defense counsel need not move for a mistrial to preserve error on a claim of prosecutorial misconduct when "he promptly objected to the [prosecutor's] statement . . . [and] [t]he objection was overruled." *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). *Phillips* is controlling here. Counsel need not move for a mistrial after an objection to the misstatement is overruled. Accordingly, we hold error was preserved in this case.

2. *Merits.* "To prevail on a claim of prosecutorial misconduct, the defendant must show both the misconduct and resulting prejudice." *Krogmann*, 804 N.W.2d at 526. In assessing whether retrial is warranted when prosecutorial misconduct is alleged, we consider the following:

> " '(1) the severity and pervasiveness of misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; (5) the extent to which the defense invited the misconduct.' "

*Id.* (quoting *State v. Boggs*, 741 N.W.2d 492, 508–09 (Iowa 2007)). Of these factors, the most important factor we consider is the strength of

the State's evidence. *Id.* Although prejudice may result from an isolated incident of prosecutorial misconduct, " '[o]rdinarily a finding of prejudice results from [p]ersistent efforts to inject prejudicial matter before the jury.' " *Id.* (quoting *State v. Webb*, 244 N.W.2d 332, 333 (Iowa 1976)).

The State on appeal does not argue that the prosecutor correctly characterized Dr. Blankenberg's testimony, but does argue lack of prejudice. The district court made no finding that the prosecutor mischaracterized the expert testimony and indeed overruled the objections of defense counsel who argued the testimony was mischaracterized. We affirm the district court on grounds that Jonas failed to meet his burden to show prejudice requiring a new trial. Several experts affirmatively testified E.N.'s brain injuries were consistent with either an impact or acceleration–deceleration mechanism. The jury heard the testimony of all the experts. The jury also heard defense counsel's objection during the cross-examination. The prosecutor's closing argument again drew an objection, and the court admonished the jurors to rely on their own recollection of the testimony. The jury was also instructed that what lawyers argue is not evidence. Prosecutors who misstate testimony risk harming their own credibility with the jury. *Cf. Krogmann*, 804 N.W.2d at 526–27 & n.10 (observing prosecutor's inappropriate comment was just as likely to offend the jury rather than score points for the state). We admonish all trial counsel to scrupulously avoid misstating or embellishing expert testimony on medical causation issues.

Yet, the district court was better positioned than an appellate court reviewing a cold transcript to determine whether any misstatements by the prosecutor prejudiced the defendant:

> It is axiomatic that a trial court is better equipped than appellate courts can be to determine whether prejudice occurs. This is because the trial court is a firsthand observer of both the alleged misconduct and any jury reaction to it.

*State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989). Jonas has cited no case on point holding a new trial was required because the prosecutor misstated an expert's testimony. Accordingly, we hold that the district court did not abuse its discretion by denying Jonas a new trial on this issue.

**XI. Aiding and Abetting and Alternative-Theory Jury Instructions.**

Jonas appeals the trial court's submission of aiding and abetting instructions on counts one, two, and five. Jonas also appeals the trial court's submission of the alternative-theory jury instruction, which allowed the jury to convict even if the jurors did not agree as to whether Jonas acted as a principal or as an aider or abettor. Jonas contends the evidence was insufficient to submit those instructions. We only address whether the court properly submitted these instructions as to counts one and two, however, because as is discussed in division XIII of this opinion, we hold the evidence insufficient to support count five.

It is well established that

> "[t]o sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission."

*State v. Spates*, 779 N.W.2d 770, 780 (Iowa 2010) (quoting *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000)). The State may prove the defendant participated in the crime by either direct or circumstantial evidence. *Hearn*, 797 N.W.2d at 580. " 'Knowledge is essential; however,

neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting.' " *Id.* (quoting *State v. Barnes*, 204 N.W.2d 827, 828 (Iowa 1972)). We have previously held that " '[e]vidence of a defendant's *presence, companionship, and conduct before and after the offense is committed* may be enough from which to infer a defendant's participation in the crime.' " *Id.* at 581 (quoting *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994)).

On July 8, the day E.N. suffered his brain injury, two people were in the Neiderbach home—Jonas and Jherica. Initially, Jherica told the hospital physician, her mother, Jonas's mother, and Detective Kelly that she was in the room with Jonas when E.N. stopped breathing. Jonas and Jherica told a mutually consistent story that failed to explain E.N.'s injuries: E.N. screamed, started gasping, and then turned blue. Jherica later recanted this story and testified that Jonas was alone with E.N. when he stopped breathing. Jherica also told detectives she may have shaken E.N. after he stopped breathing, but later testified she never shook E.N. " '[T]he jury [is] free to reject certain evidence, and credit other evidence.' " *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (quoting *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006)). Given the evidence that Jonas and Jherica were both present when the offense was committed and that they colluded with each other to explain E.N.'s condition, a reasonable jury could have concluded that Jonas aided and abetted Jherica in committing an act that resulted in E.N.'s brain injury. Accordingly, the court's submission of the aiding and abetting instruction and alternative-theory instruction for counts one and two are affirmed. For the reasons discussed in division XIII of this opinion, we hold the court erred in giving the instruction as to count five.

## XII. Weight of the Evidence.

Jonas also appeals the district court's denial of the part of his motion for a new trial that alleged the verdicts on counts three and six were contrary to the weight of the evidence presented at trial.[4] We accord the district court "broad discretion in ruling on a motion for new trial." *Reeves*, 670 N.W.2d at 202. We reverse the district court only if it has abused its discretion. *Id.* In *Reeves*, we stated:

> On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence. [*Commonwealth v.*] *Widmer*, 744 A.2d [745,] 753 [(Pa. 2000)]; *see also United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (appellate court neither sits to judge credibility of witnesses nor to reweigh the evidence; rather appellate court is limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does or does not "preponderate heavily against the verdict" is a clear and manifest abuse of discretion).

*Id.* at 203. For each challenged count, we summarize the evidence presented and analyze whether the district court abused its discretion in determining that the evidence does not preponderate heavily against the verdict.

### A. Count Three—Broken Arm.

1. *Summary of testimony.* Jonas and Jherica took E.N. to the emergency room on June 18 for what turned out to be a broken arm. Dr. Selover, the treating pediatrician, recounted Jonas's version of how the injury occurred as follows:

> Father related a history that the baby was hungry and was crying. He was sitting on a bed holding the baby. Mother went to another room to make a bottle for the baby.

---

[4]Jonas's motion also challenged the jury's verdict as to count two, but he does not appeal the denial of his motion for new trial as to that count.

> While waiting for Mom to make the bottle, the baby was still crying. Dad set the baby down onto the bed. At the time he set the baby on the bed, he related that he heard a "snap," the baby cried harder, and he discovered that there was an injury to the baby.
>
> . . . .
>
> . . . Father said that the baby put his arm behind his back as he set the child down onto the bed.

Several other witnesses testified Jonas told them a similar story.

Although none of the State's physician witnesses were willing to rule out the *possibility* that E.N.'s arm had been broken in the manner Jonas described, they all agreed that his version was highly unlikely. Dr. Smith, an expert witness for the State, emphasized that "[i]t would be so unusual you could probably publish it as a case report because it is not—certainly would be at variance with most thoughts and practices."

According to Dr. Selover, a spiral fracture resulting from setting a baby down on a bed was unlikely, in part, because

> [a] normal, healthy newborn, when you lie them down or if you lower their head, will elicit something called a Moro response. It is a primitive reflex where the baby's arms will come up in front of the baby. The legs will come as well.
>
> Also, a normal newborn, their muscle tone is such that they hold their arms and their legs in front of them. They don't put their arms behind their back.

Dr. Lindaman and the State's two expert witnesses—Dr. Smith and Dr. Jenny—also testified that E.N.'s Moro reflex and flexor tone made it unlikely his arm would have been behind his back when Jonas placed him on the bed. Dr. Selover further disputed Jonas's account, noting it was "unlikely that the baby's weight alone would provide sufficient force to fracture the baby's arm." This testimony was buttressed by Dr. Smith, who noted that "[t]he humerus is a fairly strong bone. . . . It takes a good amount of force to break that." Dr. Jenny agreed that there would need to be "a significant degree of force involved."

When asked what the mechanism of injury would be for a spiral fracture in an infant, Dr. Smith testified:

> Usually, a twisting, wrenching force. But it is possible somebody could hit the child in the arm; or it is possible, I guess, that a child might be caught, like between a car or some—you know, some hard surface and be pinned and fracture.
>
> The spiral fracture classically is a twist fracture. But there is some pretty good work in the orthopedic literature that follows the stress lines and shows that you can do it with impact too. It is just less likely, considerably less likely, with impact.
>
> . . . .
>
> . . . Usually, it is grabbing more at the elbow and twisting or wrenching, pulling out or in—I can't tell which— the arm. It takes a lot of force.

Dr. Lindaman acknowledged he had advised E.N.'s other physicians and DHS that he believed E.N.'s injury was "consistent with the history they had obtained and the one [he] had obtained." He explained, however, that at that time he was unaware flexor tone would still be present at E.N.'s age. At trial, Dr. Lindaman testified that, in his opinion, Jonas's version was unlikely because [E.N.]'s flexor tone would keep his arms in front, not behind him.

Jonas also called two expert witnesses, Dr. Blankenberg and Dr. Errol Mortimer, who testified about E.N.'s broken arm. They agreed it was possible for a spiral fracture to result from an arm being pinned while an infant is laid on his back. Dr. Mortimer further testified his opinion would be unaffected by the fact that a child of E.N.'s age would exhibit the Moro reflex and flexor tone because they "really only appl[y] to [children] when they are startled or when they are moved in a particular way."

While cross-examining Dr. Selover and Dr. Jenny, defense counsel also introduced into evidence two photographs showing E.N. being held

with his arm dangling behind his back. Defense counsel presented Dr. Selover with the first photograph, which he agreed did not show "a good example of flexor muscle tone." On redirect, however, Dr. Selover noted that it appeared E.N. was sleeping in the photograph, which was significant because "[a] sleeping baby['s muscles] will, of course, be relaxed . . . [whereas in] [a]n awake baby, the muscles are active, engaged." Defense counsel confronted Dr. Jenny with the second photograph, which showed E.N. being held by his grandmother. Dr. Jenny admitted E.N. was "not exhibiting flexor tone at that point." But, Dr. Jenny reiterated that an infant who was being laid down, as opposed to being held as was depicted in the photograph, would exhibit the Moro response and flexor tone and thus would lift his arms up in front of him.

2. *Analysis.* Jonas argues the weight of the evidence presented does not support his conviction for child endangerment under the third count. The jury instruction read as follows:

1. On or about June 18, 2009 the defendant:

a. knowingly acted in a manner that created a substantial risk to E.N.'s physical health or safety; or

b. by an intentional act or series of intentional acts, used unreasonable force: (i) that resulted in E.N. suffering a broken arm; or (ii) with the specific intent of causing a serious injury to E.N.

2. When he committed the act(s) the defendant was E.N.'s parent.

3. As a result of the defendant's acts, E.N. suffered a serious injury.

Jonas's challenge focuses on the first element of the instruction. Jonas argues the State failed to rebut his version of how E.N.'s arm was broken, given that he consistently provided the same explanation for the injury to several people and Dr. Lindaman testified that it was possible

for E.N. to have suffered a spiral fracture had his arm been pinned behind his back, as Jonas described. Jonas also claims the two photos of E.N. showing his arm "dangling to the side and down below his back" "flatly refuted" the State's expert testimony that Jonas's story was inconsistent with the involuntary physical responses of an infant E.N.'s age. Finally, Jonas emphasizes that "the prosecution never offered any alternative explanation for the injury." We disagree.

The jury heard from four physicians who testified that the presence of flexor tone and the Moro reflex in an infant E.N.'s age substantially undermined Jonas's explanation for the cause of E.N.'s broken arm because it made it unlikely E.N.'s arm would have been behind his back when he was laid down on the bed. Dr. Smith, Dr. Selover, and Dr. Jenny also testified that it would have taken a great deal of force to break E.N.'s arm. And, contrary to Jonas's assertion on appeal, the State's expert witness, Dr. Smith, described the mechanisms that usually cause spiral fractures in an infant's arm—one of which was "grabbing [E.N.'s arm] . . . at the elbow and twisting or wrenching." Considering all of the evidence in the record, we cannot say the evidence preponderates heavily against the jury's verdict finding Jonas guilty of child endangerment causing serious injury under this count.

Accordingly, we hold the district court did not abuse its discretion in denying Jonas's motion for a new trial on count three.

**B. Count Six—Failure to Seek Medical Care.**

1. *Summary of testimony.* Jherica's sister, Shannon, testified that when Jonas and Jherica dropped E.N. off at her house to have her watch him for the day on July 2 she noticed a popping on E.N.'s back:

> It was just—it almost was like a joint popping, like if you would kind of pop a knuckle, how that would feel, kind of popping in and out of place. It was every time he would

exhale—or every time he would take a breath. Every inhale and exhale it would just go "pop, pop" with that.

Shannon noted that E.N. "seemed to have some discomfort with it." Shannon testified she and Joe, Shannon's cousin who first noticed the issue, told Jonas and Jherica about the popping before they left for Jherica's appointment in Iowa City. Shannon recommended they bring it to the attention of E.N.'s pediatrician at his next doctor's appointment, which Shannon believed was in a couple of days. According to Jherica's testimony, that appointment was set for some time after July 8. E.N. was not seen by any medical professionals after Shannon raised the issue with Jonas and Jherica on July 2 until he was rushed to the emergency room on July 8.

Jherica testified at trial that her cousin "Joe said that it felt like it was a broken rib." On cross-examination, defense counsel impeached Jherica with the following statement made in her proffer for her guilty plea: "He told us there was something wrong, but I didn't know it was broken ribs." To which Jherica responded, "He told us that there was something wrong and it felt like broken ribs." Defense counsel then pointed out that Jherica had affirmatively denied that she was told the popping was from a broken rib:

> Q. When you were asked: Question: "And they say— Joe says, I have had a broken rib and that baby is in pain. And when Shannon and Joe"—you interrupt, don't you? A. Yes.
>
> Q. What do you say? A. I said, "They did not say this was what it was while I was there."

Defense counsel also asked Jherica about a conversation she had with her mother while she was in jail. Jherica admitted that she had told her mother that if she had known that E.N.'s rib was broken that she would have taken him to the hospital. Joe did not testify at trial.

The day after E.N. was at Shannon's, Jonas and Jherica left E.N. with Jherica's mother, Connie. E.N. became so fussy during this visit that Connie had to return him to his parents at the Neiderbach home. Connie noted that E.N.'s crying was "[p]retty much constant" and was not alleviated by feeding him, changing his diaper, or her attempts at consoling him. While Jonas's mother, Mary, was watching E.N., after Connie returned him to the Neiderbach home, she noticed a popping in E.N.'s back. Connie had alerted her to it when she dropped E.N. off at her home. Mary testified she did not believe the popping was causing E.N. any pain and she was unaware E.N.'s ribs were broken at that time. Jon noticed clicking in E.N.'s back a couple of days later on July 5. He brought it up to Mary, and they generally agreed that the issue should be raised at E.N.'s next appointment with his pediatrician, which was scheduled for later that week.

Dr. Ekhardt, one of the physicians treating E.N. at Blank Children's Hospital, admitted that "[t]here is no treatment for broken ribs"; however, she explained the treating physician "would have given pain medicine because it is painful . . . and [would] follow him to make sure it healed well." Dr. Ekhardt also testified that to her knowledge E.N. had not suffered a secondary injury from the broken ribs, such as a punctured lung. Dr. Lindaman testified an infant would show signs of distress or pain after suffering multiple rib fractures "for the better part of the day and any other time that those multiple rib fractures were moved."

2. *Analysis.* Jonas claims the verdict as to count six, which charged Jonas with child endangerment for failing to seek medical care for E.N.'s broken ribs, is contrary to the weight of the evidence. The jury instruction for this count required the State to prove the following:

     1. On or about between approximately July 2, 2009 and July 8, 2009 the defendant deprived E.N. of health care by willfully failing to take him for treatment of broken ribs.

     2. At that time the defendant was E.N.'s parent.

     3. At that time the defendant was reasonably able to make provisions for E.N.'s health care.

     4. The deprivation of such health care caused substantial harm to E.N.'s physical health.

     5. As a result of the deprivation, E.N. suffered a bodily injury other than the injury for which the health care was needed.

The jury instructions defined "bodily injury" as "physical pain, illness or any impairment of physical condition."

Jonas contends the weight of the evidence fails to establish he knew or should have known E.N.'s ribs were broken and, thus, needed medical care. Rather, Jonas argues the evidence merely "showed an awareness of a 'popping' feel in E.N.'s back . . . which his sister-in-law advised needed to be checked out." This same popping or clicking was also noticed by Connie, Jon, and Mary—none of whom believed the issue required immediate medical attention. Jonas thus argues:

> If the grandparents, who collectively have over one hundred years of experience raising children, did not believe [E.N.] was ever in need of medical care, then how could Jonas— who had only been a father for just over a month—possibly be expected to have known[?]

Yet, Jherica testified at trial that Joe told her *and* Jonas that he believed E.N.'s ribs were broken. Although Shannon testified that she and Joe were less specific on this point, it is not our role to judge the credibility of witnesses on our appellate review. *See Reeves*, 670 N.W.2d at 203. Rather, we only consider "whether the district court's determination that the evidence . . . does not 'preponderate heavily against the verdict' [was] a clear and manifest abuse of discretion." *Id.* (quoting *Ashworth*, 836 F.2d at 266). We cannot say the evidence

preponderated *heavily* against the conclusion that Jonas knew or should have known E.N.'s ribs were broken and the baby was in need of medical attention.

Jonas also argues the weight of the evidence was contrary to the verdict under this count because there is no treatment for broken ribs and because there was no evidence that "[a]s a result of the deprivation, E.N. suffered a bodily injury other than the injury for which the health care was needed." Jonas also contends there is no evidence E.N. suffered "a separate and subsequent serious injury," and the State failed to prove "[E.N.] was ever in a state of pain for which [Jonas] either directly or aided and abetted in denying him medication."

Significantly, however, Dr. Ekhardt testified that although there is no treatment for broken ribs, E.N. still should have been brought in to see a physician so that the healing of his ribs could be monitored and pain medication could be prescribed. The fact that severe pain from the untreated rib injuries could have been alleviated by medical intervention and medication is enough to support a conviction. *See State v. McKee*, 312 N.W.2d 907, 913 (Iowa 1981) (adopting the Model Penal Code definition of bodily injury). Connie testified that E.N. was so inconsolable the night he was with her that she was forced to return him to the Neiderbach household, even though she tried feeding him and changing his diaper. A reasonable jury could have inferred from the evidence that broken ribs caused the baby's pain.

Considering all of the evidence in the record, we cannot say the evidence preponderates heavily against the jury's verdict finding Jonas guilty of child endangerment for failing to seek medical care for E.N.'s broken ribs.

Accordingly, we hold the district court did not abuse its discretion in denying Jonas's motion for a new trial on count six.

### XIII.  Sufficiency of the Evidence.

Jonas contends the evidence supporting counts four and five relating to E.N.'s broken ribs was insufficient.  For these challenged counts, we summarize the evidence presented and analyze whether it was sufficient to sustain his conviction under each count.

When we review a challenge to the sufficiency of the evidence supporting a guilty verdict, we consider all of the evidence in the record " 'in [a] light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.' " *Sanford*, 814 N.W.2d at 615 (quoting *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002)).  We uphold the verdict if there is substantial evidence in the record supporting it.  *Id.*  "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt."  *Id.*  We recognize that " 'the jury [is] free to reject certain evidence, and credit other evidence.' "  *Id.* (quoting *Nitcher*, 720 N.W.2d at 556).  Circumstantial evidence is equally as probative as direct evidence.  *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011).  "Evidence is not substantial if it raises only suspicion, speculation, or conjecture."  *Yeo*, 659 N.W.2d at 547–48.

**A. Summary of Testimony.**  E.N.'s rib fractures were first discovered by physicians when the hospital did a bone survey on July 9, the day after an unresponsive E.N. was rushed to the emergency room.  Dr. Smith testified that E.N.'s bone survey revealed fifteen separate rib fractures, some on the same rib.  Dr. Smith explained his process of dating rib fractures:

When a bone breaks, like a rib, it takes about seven days for the knitting of the bone by X-ray to begin [so] that you can actually see something called callus, which is the body's healing attempt at the fracture.

If you have a rib fracture with no callus about it, then that rib fracture could have happened immediately, or it could have happened anywhere in the preceding seven days.

Dr. Smith was able to identify three fractures that were "fresh, in that zero-to-seven range." The remaining fractures "were in the two- to four-week range." He estimated that the oldest rib fractures were about four weeks old.

Dr. Smith testified that many of the rib fractures were on E.N.'s back, which he described as important because those are "very hard to get any other way than severe compression or squeezing." He noted that "[i]t is possible to break them with a direct blow, but usually it is hard squeezing." He also noted a number of lateral (side) rib fractures. With regard to these fractures, he explained as follows:

As you recall, a rib is a curved structure. I am holding my hand in a "C" shape, with the attachment to the spine here where my right hand is and the attachment to breast bone where my index finger is (indicating). So if you squeeze hard, you are going to put maximum stress right where my thumb joins my index finger. Those are called lateral rib fractures. That is where they snap.

Dr. Jenny gave similar testimony regarding the cause of E.N.'s rib fractures:

The multiple rib fractures are consistent with multiple episodes of having excessive pressure applied to the chest, squeezing the chest. It is actually hard to break baby ribs because they are very flexible.

If you punch a baby in the chest, they don't break. But if you squeeze real hard—it is kind of like squeezing a beer can—they break at the sides and the back. When it squeezes shut, it pops at the sides and pops at the back. It takes excessive pressure to cause that degree of fractures. Those fractures are very painful.

During both time periods identified by the State under counts four and five—June 17 to June 30, 2009, and July 1 to July 8, 2009—E.N. was alone with a number of different adult caregivers, including Jherica, Jon, Mary, Shannon, and Connie. Jherica testified Jonas had no previous experience caring for babies and that he would become "impatient" when feeding E.N. because of issues with the bottle. When E.N. would cry, Jonas would pick him up and "kind of accelerate his voice," telling E.N. "there is no need to cry," or to "stop crying." Jherica believed this scared E.N. When Jonas was unable to console E.N., he would get "frustrated" and "would just pass him off to the next person, whether that [was Jherica] or one of his parents." Jherica testified that she never saw Jonas do anything that would have broken E.N.'s ribs.

**B. Count Four Analysis—Older Rib Fractures.** Jonas argues the State presented insufficient evidence to sustain his conviction under count four. The fourth count of the trial information charged Jonas with child endangerment for causing the older rib fractures. The jury instruction required the State to prove:

> 1. On or about between approximately June 17, 2009 and June 30, 2009 the defendant:
>
>> a. knowingly acted in a manner that created a substantial risk to E.N.'s physical health or safety; or
>>
>> b. by an intentional act or series of intentional acts, used unreasonable force: (i) that resulted in E.N. suffering a broken rib or ribs; or (ii) with the specific intent of causing serious injury to E.N.
>
> 2. When he committed the act(s), the defendant was E.N.'s parent.
>
> 3. As a result of the acts, E.N. suffered a serious injury.

Jonas argues the State failed to present "a scintilla of evidence . . . that puts Jonas in proximity with E.N. from June 17th to June 30th from

which it can be inferred that Jonas committed an act resulting in broken ribs." Jonas relies on *Hickman,* in which we held "[t]he three separate acts required under [Iowa Code section 726.6A] should be established with enough precision to enable a jury to be satisfied beyond a reasonable doubt of a time and place where each of the three acts occurred." 576 N.W.2d at 368. We subsequently clarified that

> this rule does not mean that evidence of the *precise* time and place of each incident or act is required, but merely means the three or more acts must be separated by time and place so that each incident is separate and distinct.

*Yeo*, 659 N.W.2d at 550. We then noted as follows:

> This approach is consistent with the language of the statute, as well as our general rule that the State is not required to prove the precise time and place of a crime. It is also compatible with the very nature of child abuse, and the inherent difficulty of establishing precise times and places of abuse to children due to the frequent delay in the discovery of the abuse, as well as other factors based on the nature of the crime.

*Id.* (citations omitted).

Under this standard, we held that the state had presented evidence sufficient to convict Yeo of each of the four separate counts of child endangerment. *Id.* at 551. At trial, the witness testimony had established Yeo was present each time the child was injured and had committed acts of abuse that were consistent with the child's injuries. *Id.* at 549, 551; *see also State v. Sayles*, 662 N.W.2d 1, 3–7 (Iowa 2003) (holding evidence sufficient because circumstantial evidence established that child–victim was uninjured immediately before being left in the care of the defendant); *State v. Watkins*, 659 N.W.2d 526, 537 (Iowa 2003) (holding evidence sufficient when state proved the nonaccidental injuries were inflicted while the child–victim was in the exclusive care of the defendant).

The State's evidence in this case, unlike that in *Yeo*, fails to meet the sufficiency threshold. A number of people aside from Jonas had been alone with E.N. during the time frame E.N.'s older rib fractures occurred, including Jherica; her mother, Connie; and sister, Shannon, as well as Jonas's parents, Jon and Mary. The State presented no evidence establishing Jonas was alone with E.N. when the rib injuries occurred or that anyone saw Jonas squeeze E.N.

In its brief, the State appears to rely on a propensity argument in defending the sufficiency of the evidence under this count:

> Neiderbach had no patience with [E.N.]'s crying and [E.N.] was crying, and Neiderbach was alone with him, just before [E.N.] suffered the two injuries that can be specifically dated—the broken arm and the brain injury. Rational jurors could find that it was Neiderbach who squeezed [E.N.] and broke his ribs between approximately June 17 and June 30.

Normally, however, "evidence of one crime cannot be used to prove another crime occurred." *State v. White*, 668 N.W.2d 850, 853 (Iowa 2003).

The evidence presented by the State at trial does little more than "raise[] . . . suspicion, speculation, or conjecture" that Jonas broke the baby's ribs. *Yeo*, 659 N.W.2d at 548. We conclude the evidence was insufficient to support his conviction under count four.

**C. Count Five Analysis—Fresh Rib Fractures.** Jonas argues the State presented insufficient evidence to sustain his conviction under count five. The fifth count charged Jonas with child endangerment for causing or aiding and abetting another who caused the new rib fractures. The jury instruction required the State to prove:

> 1. On or about between approximately July 1, 2009 and July 8, 2009 the defendant:

a. knowingly acted in a manner, or aided and abetted another in acting in a manner, that created a substantial risk to E.N.'s physical health or safety; or

b. by an intentional act or series of intentional acts, used unreasonable force: (i) that resulted in E.N. suffering a broken rib or ribs; or (ii) with the specific intent of causing a serious injury to E.N., or aided and abetted another in doing so.

2. When he committed, or aided and abetted, the act(s), the defendant was E.N.'s parent.

3. As a result of the acts, E.N. suffered a serious injury.

As with count four, Jonas's challenge to his conviction on count five centers on the first element of the jury instruction. Jonas specifically argues the State presented insufficient evidence to establish when E.N.'s fresh rib injuries occurred so as to allow a reasonable jury to conclude beyond a reasonable doubt that Jonas committed an act causing those injuries or aided and abetted another to do so.[5] We agree.

Although this count differs from the previous count in that Jonas could be convicted if he either committed the act himself or aided and abetted the person who did, the evidence was insufficient under either theory. Several other people were alone with E.N. during this time period, including Jherica, Jon, Mary, Shannon, and Connie. The State did not present any evidence, direct or circumstantial, proving Jonas caused the fresh rib injuries or aided or abetted someone who did.

---

[5]Jonas also argues the State failed to prove the fresh rib fractures were caused by a mechanism other than the one that caused E.N.'s brain injuries. The State contends Jonas did not preserve this argument for appeal because "Neiderbach did not complain [at trial] that the acts causing the fresh fractures (Count 5) were not proven to be separate and distinct from those causing the brain injury (Count 2)." "To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). Because we hold the evidence was insufficient under Jonas's first argument, we decline to address whether Jonas preserved his second argument for appeal.

Accordingly, we conclude the evidence is insufficient to support his conviction on count five.

### XIV. Conclusion.

We vacate the convictions on counts four and five because the evidence was insufficient to prove Jonas inflicted E.N.'s rib injuries. We reverse the order denying Jonas's motion for an in camera review of Jherica's mental health records. We remand the case to allow the district court to conduct that review pursuant to Iowa Code section 622.10(4)(*a*)(2) (Supp. 2011) to determine whether her records contain exculpatory information. We affirm on all other issues. If no exculpatory evidence is found, Jonas's convictions on counts one, two, three, and six are affirmed, and the district court shall resentence Jonas. If exculpatory evidence is found, then the district court shall proceed as set forth in section 622.10(4)(*a*)(2)(c) and (d) to determine whether Jonas is entitled to a new trial.

**AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Cady, C.J., who concurs specially, and Appel, Wiggins, and Hecht, JJ., who separately concur specially.

**CADY, C.J. (concurring specially).**

I concur in the majority opinion, but write separately to express my view that the statutory standard for judicial review of confidential records under Iowa Code section 622.10(4) (Supp. 2011) should be given its definition through the application of facts on a case-by-case basis. As this case and *State v. Thompson*, 836 N.W.2d 470, 484 (Iowa 2013), illustrate, the facts are what should breathe meaning into the "reasonable probability" standard, and this standard will continue to gain greater clarity in the future as additional cases continue to give it shape.

**APPEL, Justice (concurring specially).**

For the reasons expressed below, I conclude the judgment of the district court must be vacated to allow for an in camera inspection of Jherica Richardson's mental health records under Iowa Code section 622.10(4) (Supp. 2011). I write separately, however, to express my views on the important issues raised in this case and in the companion case of *State v. Thompson*, 836 N.W.2d 470 (Iowa 2013), also decided today. As will be demonstrated below, the legal issue in these cases with respect to the new statute is not whether the legislature's solution is "better" than the approach of this court in *State v. Cashen*, 789 N.W.2d 400, 407–10 (Iowa 2010), but only whether the legislature's approach is constitutional on its face. *See State v. Mauti*, 33 A.3d 1216, 1229 (N.J. 2012) (stating that where the legislature has enacted a privilege, the court's "own conclusions about what would be better policy are simply of no consequence"); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. ___, ___, 132 S. Ct. 2566, 2600, 2608, 183 L. Ed. 2d 450, 464, 499 (2012) (noting it is not the Court's role to pass upon the wisdom of the Federal Affordable Care Act's requirement that individuals pay a tax if they do not obtain health insurance, but rather only upon its constitutionality). Although the challenged provisions of the new statute may be constitutionally problematic in some applications, I conclude the statute is facially constitutional when interpreted as explained below.

I also write to more thoroughly explore the issue of whether the photograph and video depicting the medical condition of E.N. were properly admitted into evidence. I conclude this evidence was properly admitted. In addition, I write to elaborate on the question of the admission through expert testimony of hearsay evidence found in

published journal articles. I conclude admission of this evidence was improper.

**I. Issues Surrounding Production of Mental Health Records in Criminal Cases.**

**A. Introduction.**

1. *Positions of the parties.* Neiderbach claims the district court erred in denying his request to review Jherica's mental health records. According to Neiderbach, Jherica's "long stretch of postnatal bizarre behavior and depression" warranted investigation of her records. Neiderbach asserts there may be evidence in the records "that would affect her ability either to perceive events accurately or to credibly testify in court or [that] may establish motive." Neiderbach claims the failure to produce the mental health records violates the Due Process Clauses of the Iowa and United States Constitutions and his right to effectively cross-examine witnesses.[6]

Neiderbach relies upon our holding in *Cashen,* where we outlined a protocol related to the production of mental health records in criminal trials. 789 N.W.2d at 407–10. We required production of mental health records in a criminal trial when the defendant shows "a reasonable basis to believe the records are likely to contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt." *Id.* at 408. Once a defendant made this showing, we required mental health records

---

[6]The parties address the issues in this case as involving due process under the United States and Iowa Constitutions. There is a question whether documents in the possession of a private party implicate standard due process protections. When mental health records are in the hands of a private party, courts have applied a due-process-type analysis under the Confrontation Clauses of State and Federal Constitutions. *See, e.g., Burns v. Delaware,* 968 A.2d 1012, 1024–25 (Del. 2009); *State v. Kelly,* 554 A.2d 632, 635–36 (R.I. 1989). I regard Neiderbach's argument that the district court ruling violated his right to effectively cross-examine witnesses as raising a claim under the Confrontation Clause of the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution.

to be produced under a protective order designed to safeguard the confidentiality of the records. *Id.* at 408–09. We rejected in camera inspection of the records, explaining that the court "cannot foresee what may or may not be important to the defendant." *Id.* at 409.

Neiderbach recognizes that after our decision in *Cashen*, the legislature amended Iowa Code section 622.10 by adding a new subsection. *See* 2011 Iowa Acts ch. 8, § 2 (codified at Iowa Code § 622.10(4) (Supp. 2011)). Among other things, the new subsection provides that before discovery of mental health records the defense must show "a reasonable probability that the information sought is likely to contain exculpatory information." Iowa Code § 622.10(4)(*a*)(2)(a). Second, the new subsection provides that a defendant seeking production of mental health records must show the information "is not available from any other source." *Id.* Once the defendant has shown "a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source," the court must conduct an in camera inspection of the documents to determine whether the records contain exculpatory information. *Id.* § 622.10(4)(*a*)(2)(b). Neiderbach attacks each of these provisions as a violation of the *Cashen* principles and his rights to due process and confrontation under the Iowa and Federal Constitutions.

Neiderbach further claims the district court improperly applied section 622.10(4)(*a*)(2)(a) to the facts of this case. Neiderbach notes that, among other things, he presented evidence to the district court that Jherica smoked marijuana during her pregnancy, that she had demonstrated a pattern of dishonest conduct, that she admitted frustration while taking care of her newborn son, that she flashed her breasts two days after her son's traumatic brain injury, that she

threatened to starve herself to get out of jail, and that she called a funeral home to report that her son had died and inquire about services and prices even though he was alive. Neiderbach argues the district court's conclusion that this evidence did not meet the statutory threshold for production of mental health records was contrary to *Anfinson v. State*, 758 N.W.2d 496, 505–06 (Iowa 2008), where we found there was a possible nexus between postpartum depression and infanticide. Neiderbach also cites cases noting a witness's mental condition at the time of events about which he or she testifies can impact credibility. *See East v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995) (noting mental health records can cast doubt on the accuracy of a witness's testimony); *United States v. Lindstrom*, 698 F.2d 1154, 1160 (11th Cir. 1983) ("Certain forms of mental disorder have high probative value on the issue of credibility.").

The State responds by attacking the *Cashen* protocol, arguing it improperly balances a "defendant's statutory or rule-based interest in discovery" with a "patient's qualified constitutional right to privacy in mental health records." In any event, the State further asserts the challenged provisions of section 622.10(4)(*a*)(2) are constitutional.[7] According to the State, Neiderbach failed to show a reasonable probability that the mental health records sought were likely to contain exculpatory information and, instead, showed only a possibility that the records might contain exculpatory information. In addition, the State

---

[7]Niederbach's constitutional challenge is limited to the threshold requirement for production, the role of evidence "available from any other source," and the in camera review of mental health records under sections 622.10(4)(*a*)(2)(a) and 622.10(4)(*a*)(2)(b). This case does not involve a facial or as-applied constitutional challenge to section 622.10(4)(*a*)(2)(c), which requires the district court to balance the need for disclosure against the privacy interest if the records contain exculpatory evidence. I express no view on any issue that might arise under section 622.10(4)(*a*)(2)(c).

contends Neiderbach failed to show the information sought was unavailable from other sources. Finally, the State asserts that to the extent Neiderbach has met his burden on the question of production of mental health records, the in camera inspection provision of section 622.10(*a*)(2)(b) is constitutional under *Pennsylvania v. Ritchie*, 480 U.S. 39, 57–58, 107 S. Ct. 989, 1001–02, 94 L. Ed. 2d 40, 57–58 (1987), and because a defendant will have to identify the information sought with reasonable specificity, enabling the district court to better find potentially exculpatory evidence.

2. *Evidentiary privilege and the right of a criminal defendant to "every man's evidence."* As was noted by the Supreme Judicial Court of Massachusetts, "when relevant evidence is excluded from the trial process for some purpose other than enhancing the truth-seeking function, the danger of convicting an innocent defendant increases." *Commonwealth v. Bishop*, 617 N.E.2d 990, 994 (Mass. 1993), *abrogated on other grounds by Commonwealth v. Dwyer*, 859 N.E.2d 400, 414 (Mass. 2006). In a similar vein, the United States Supreme Court has said that "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States*, 384 U.S. 855, 870, 86 S. Ct. 1840, 1849, 16 L. Ed. 2d 973, 984 (1966). Thus, while the issues surrounding the production of mental health records in this case may appear merely procedural on the surface, they are actually much more important than that. As Justice Frankfurter observed, "The history of American freedom is, in no small measure, the history of procedure." *Malinski v. New York*, 324 U.S. 401, 414, 65 S. Ct. 781, 787, 89 L. Ed. 1029, 1037 (1945).

In this case, we must determine whether our procedures related to the production of mental health records in a criminal case will

adequately and reliably allow a defendant access to probative information that could bear on his possible conviction and subsequent long term of incarceration. The suppression of important evidence bearing on the truth or the innocence of a defendant in a criminal trial and the refusal to look for available exculpatory evidence in the name of furthering other social goals raise serious questions regarding the rights to due process and confrontation, to say the least, and in their extreme forms, represent the underpinning of show trials and the criminal justice systems of totalitarian regimes. On the other hand, *unnecessary* disclosure of mental health records is inconsistent with the legislative policy behind privilege statutes and our recognition of the privacy interests of mental health patients. *See McMaster v. Iowa Bd. of Psychology Exam'rs*, 509 N.W.2d 754, 758–59 (Iowa 1993).

Looking broadly at modern legal developments, the arc of the caselaw seeks to ensure a defendant has access to evidence sufficient to provide a fair trial. *See, e.g.*, *Ritchie*, 480 U.S. at 57–58, 107 S. Ct. at 1001–02, 94 L. Ed. 2d at 57–58 (holding due process requires that a statutory privilege give way to in camera inspection of exculpatory evidence); *Davis v. Alaska*, 415 U.S. 308, 318–20, 94 S. Ct. 1105, 1111–12, 39 L. Ed. 2d 347, 354–56 (1974) (holding juvenile records made confidential by statute admissible to show witness bias); *Chambers v. Mississippi*, 410 U.S. 284, 298–302, 93 S. Ct. 1038, 1047–49, 35 L. Ed. 2d 297, 310–13 (1973) (holding a defendant's right to present witnesses in his own defense permitted the defendant to present hearsay testimony under the exception for declarations against a declarant's penal interest notwithstanding Mississippi's failure to recognize such an exception); *Washington v. Texas*, 388 U.S. 14, 16–17, 22, 87 S. Ct. 1920, 1922, 1925, 18 L. Ed. 2d 1019, 1021–22, 1025 (1967) (holding a criminal

defendant's right to have compulsory process for obtaining witnesses in his defense trumped a state statute prohibiting persons charged or convicted as coparticipants in the same crime from testifying on each other's behalf even if they would have given relevant and material testimony).

3. *Importance of the doctrine of constitutional avoidance to the interpretation of legislative acts.* As noted, the legislature codified a protocol for the production of mental health records in response to our *Cashen* decision. The new statute seeks to modify the *Cashen* protocol in several key respects, including substituting in camera inspection of documents for production of documents to the parties under the control of protective orders.

Legislative enactments are entitled to great respect and may be held constitutional even if the court disagrees with the policy choices of the legislature. At the same time, however, the legislature cannot deprive a criminal defendant of his or her constitutionally protected right to due process. Under one principle of constitutional avoidance, we seek to interpret a legislative enactment in a fashion that avoids constitutional problems. *Simmons v. State Pub. Defender*, 791 N.W.2d 69, 74 (Iowa 2010); *State v. Nail*, 743 N.W.2d 535, 539–40 (Iowa 2007); *State v. Wiedrien*, 709 N.W.2d 538, 542 (Iowa 2006); *State v. Kueny*, 215 N.W.2d 215, 216–17 (Iowa 1974); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348, 56 S. Ct. 466, 483, 80 L. Ed. 688, 712 (1936) (Brandeis, J., concurring) (" 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S. Ct. 285,

296, 76 L. Ed. 598, 619 (1932))). This principle is an important feature of the judicial review landscape. Several state courts have applied it to uphold statutes dealing with counseling privileges. *See, e.g., People v. Stanaway*, 521 N.W.2d 557, 574–75 (Mich. 1994); *Commonwealth v. Ritchie*, 502 A.2d 148, 151–54 (Pa. 1985), *rev'd on other grounds by Ritchie*, 480 U.S. at 60–61, 107 S. Ct. at 1003, 94 L. Ed. 2d at 59–60. A corollary to the doctrine of constitutional avoidance is the notion that statutes should not be lightly found facially unconstitutional. In order to be unconstitutional on its face, a statute must be " 'void for every purpose and cannot be constitutionally applied to any set of facts.' " *War Eagle Vill. Apartments v. Plummer,* 775 N.W.2d 714, 722 (Iowa 2009) (quoting *F.K. v. Iowa Dist. Ct.,* 630 N.W.2d 801, 805 (Iowa 2001)). As explained below, application of the doctrine of constitutional avoidance requires us to find the challenged provisions of section 622.10 facially constitutional.

**B. Reasonable Probability That the Privileged Records Sought May Likely Contain Exculpatory Information.** The first issue is the facial constitutionality of the showing necessary before production of mental health records is required under the new statute—namely, that the requesting party show "a reasonable probability that the privileged records sought may likely contain exculpatory information." Iowa Code § 622.10(4)(*a*)(2)(b); *see also id.* § 622.10(4)(*a*)(2)(a).

At the outset, it is critical to distinguish between the appropriate test for production and the appropriate test for disclosure of the records. *See, e.g., Bishop,* 617 N.E.2d at 996–98; *Goldsmith v. State,* 651 A.2d 866, 877 (Md. 1995); *Stanaway,* 521 N.W.2d at 575; *State v. Green,* 646 N.W.2d 298, 309 (Wis. 2002). The test for production performs a threshold function that opens the door to simply examining the records

to see if they in fact contain evidence relevant and material to the defense. The test for disclosure is applied only after the records have been examined and found to contain material and relevant evidence. Any factual or legal questions surrounding the issue of whether documents provided for in camera inspection must be disclosed to the defendant are not now before the court and are not addressed or determined in this case. We deal here with only the threshold test pertaining to the production of documents.

With respect to the threshold function, there appears to be a broad consensus that the mere existence of mental health records is not enough to impose a constitutional requirement that they be produced in any criminal case. *See, e.g., D.P. v. State*, 850 So. 2d 370, 374 (Ala. Crim. App. 2002) (holding that "when a defendant sufficiently alleges that privileged documents may contain evidence relevant and material to an issue in the case, the trial court should inspect the documents in camera before ruling on the defendant's motion"); *People v. Dist. Ct.*, 719 P.2d 722, 726 (Colo. 1986) ("The vague assertion that the victim may have made statements to her therapist that might possibly differ from the victim's anticipated trial testimony does not provide a sufficient basis to justify ignoring the victim's right to rely upon her statutory privilege."); *People v. Foggy*, 521 N.E.2d 86, 91–92 (Ill. 1988) (rejecting a defendant's general request for an in camera inspection of counseling records because the request did not indicate the records "would provide a source of impeachment"); *Bishop*, 617 N.E.2d at 994–95 (noting a defendant may not have access to a victim's privileged records in all circumstances). These cases are grounded in the notion that privacy interests—even to the minimal extent invaded by in camera inspection by a judge—should not be sacrificed unnecessarily on overly speculative

showings.[8]  Yet, because a defendant's liberty interests are at stake in a criminal trial, the standard for production cannot be too high.  As noted in *Bishop*, "when relevant evidence is excluded . . . for some purpose other than enhancing the truth-seeking function, the danger of convicting an innocent defendant increases."   617 N.E.2d at 994.

Further, as noted in *Ritchie*, it is impossible to say with assurance that medical records will contain relevant information when no side has seen the records.  480 U.S. at 57, 107 S. Ct. at 1001, 94 L. Ed. 2d at 57. To require a defendant to describe with particularity the relevance of information in documents he has never seen is something of a catch-22.[9] *State v. Bassine*, 71 P.3d 72, 76 n.9 (Or. Ct. App. 2003); *accord Foggy*, 521 N.E.2d at 96 (Simon, J., dissenting) (describing a requirement that the defendant demonstrate knowledge of the contents of a mental health record that the defendant does not have as "a perfect Catch-22"); *State v. Graham*, 702 A.2d 322, 326 (N.H. 1997) (noting a requirement that the defendant articulate the " 'precise nature' of the purported contents of the records . . . would effectively render review superfluous, as the defendant essentially would have to obtain the information itself in order to meet his burden"); *State v. Gagne*, 612 A.2d 899, 901 (N.H. 1992)

---

[8]I resist the sporting analogy to "fishing" that many courts cannot resist.  The metaphor, like all metaphors, is entertaining but often merely used to state a conclusion rather than to provide any meaningful analysis.  In fact, because the mental health records are not available to the defense at the time of the effort to obtain their production, there is always an element of "fishing" in the request.  The fish is in the lake, not the boat, even when the most compelling request is made.  It might be more accurate to state that fishing with a baitless hook won't do.  In any event, I think it better to leave fishing to the people who fish and for courts to employ legal analyses rather than catchy phrases to determine the outcome of a case.

[9]"Catch-22" is a phrase utilized by novelist Joseph Heller to describe "a problematic situation for which the only solution is denied by a circumstance inherent in the problem or by a rule."  *Merriam–Webster's Collegiate Dictionary* 194 (11th ed. 2003).

(noting trial courts, in determining whether an in camera review is warranted, "cannot realistically expect defendants to articulate the precise nature of the confidential records without having prior access to them").

The Iowa statute provides that a party must in good faith show a "reasonable probability" that production of the mental health records "may likely" produce exculpatory evidence. Iowa Code § 622.10(4)(*a*)(2)(b); *see also id.* § 622.10(4)(*a*)(2)(a). The phrase "reasonable probability" has been used in a number of other statutes and by a number of other courts in the context of establishing a threshold requirement for the production of mental health records. *See, e.g., State v. Pinder,* 678 So. 2d 410, 417 (Fla. 1996) ("To obtain in camera review of confidential communications or records . . . a defendant must first establish a reasonable probability that the privileged matters contain material information necessary to his defense."); *Commonwealth v. Fuller*, 667 N.E.2d 847, 855 (Mass. 1996) ("A judge should undertake an in camera review of [privileged records] only when a defendant's motion for production of the records has demonstrated a good faith, specific, and reasonable basis for believing that the records will contain exculpatory evidence which is relevant and material to the issue of the defendant's guilt."), *abrogated by Dwyer*, 859 N.E.2d at 414; *see also Stanaway,* 521 N.W.2d at 574 (permitting in camera inspection upon "a showing that the defendant has a good-faith belief, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense"). As commentators have explained, terms such as "reasonable probability" in mental health records statutes are extremely elastic and subject to judicial interpretation. *See* Clifford S. Fishman, *Defense Access to a*

*Prosecution Witness's Psychotherapy or Counseling Records*, 86 Or. L. Rev. 1, 40 (2007) [hereinafter Fishman]. As noted by one court, a reasonable probability "lies somewhere between 'mere possibility' and 'more likely than not.' " *State v. Blake*, 63 P.3d 56, 61 (Utah 2002) (quoting *State v. Knight*, 734 P.2d 913, 920 (Utah 1987)).

To adequately protect a criminal defendant's rights to due process and confrontation, the statute must be interpreted in a fashion that provides adequate opportunity for a party to uncover evidence relevant to actual guilt or innocence in a criminal proceeding. *Cf. California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413, 419 (1984) (noting that due process requires "that criminal defendants be afforded a meaningful opportunity to present a complete defense," which includes access to exculpatory evidence). As a result, while the term "reasonable probability" in the statute requires a showing more than the mere fact that mental health records of a witness or accuser exist, all that is required is some plausible theory founded in demonstrable fact that suggests the information in the mental health records might well prove helpful to the defense. As noted by the New Hampshire Supreme Court:

> The threshold showing necessary to trigger an *in camera* review is not unduly high. The defendant must meaningfully articulate how the information sought is relevant and material to his defense. To do so, he must present a plausible theory of relevance and materiality sufficient to justify review of the protected documents, but he is not required to prove that his theory is true. At a minimum, a defendant must present some specific concern, based on more than bare conjecture, that, in reasonable probability, will be explained by the information sought.

*State v. Hoag*, 749 A.2d 331, 333 (N.H. 2000) (quoting *Graham*, 702 A.2d at 325–26). Other state courts agree with this approach. *See Burns v. State*, 968 A.2d 1012, 1025 (Del. 2009) (holding "a defendant need only

make a 'plausible showing' that the records sought are material and relevant"); *Green*, 646 N.W.2d at 310 (noting the Wisconsin standard for production "is not intended . . . to be unduly high for the defendant"). At least one court, however, has concluded that because of the nature of the crime and the importance of potential impeachment, a defendant charged with sexual abuse of a minor is constitutionally entitled to an in camera inspection of records to determine whether the records contain exculpatory information. *State v. McGill*, 539 S.E.2d 351, 355 (N.C. Ct. App. 2000).

The plausible theory of relevance standard is consistent with the United States Supreme Court's approach in *United States v. Valenzuela-Bernal*, 458 U.S. 858, 871–74, 102 S. Ct. 3440, 3448–49, 73 L. Ed. 2d 1193, 1205–07 (1982), where the Court held a defendant could not show the government violated his rights to due process and compulsory process by deporting alien witnesses absent some "plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense." *See also Washington*, 388 U.S. at 23, 87 S. Ct. at 1925, 18 L. Ed. 2d at 1025 (holding a state cannot arbitrarily prohibit a defendant from exercising his Sixth Amendment right to compulsory process when the evidence is relevant and material to his defense). When in doubt, the district court should tip the balance toward production of mental health records to preserve the criminal defendant's constitutional rights to due process and confrontation.[10]

[10]Courts have ordered production in camera under statutes similar to Iowa's in a wide variety of settings. *See, e.g., State v. Gagne*, 612 A.2d 899, 900–02 (N.H. 1992) (holding the defendant made a plausible showing that he was entitled to privileged records where, among other things, he asserted the records might reveal a victim's prior inconsistent statements and the extent to which state counselors may have participated in preparing the victims for trial); *In re L.J.P.*, 637 A.2d 532, 538 (N.J. Super. Ct. App. Div. 1994) (holding the defendant's showing that records might indicate the victim

To avoid constitutional problems under the United States and Iowa Constitutions, the phrase "reasonable probability" in section 622.10(4)(*a*)(2) should be construed to require only a plausible showing that exculpatory evidence may likely be uncovered when the records are produced. Based upon the above interpretation, section 622.10(4)(*a*)(2)'s reasonable probability threshold meets constitutional muster under the Due Process and Confrontation Clauses of the United States and Iowa Constitutions.

**C. Information That Is Not Available From Any Other Source.**
The next issue is the facial constitutional challenge to the provision of the new statute regarding other sources of information. Iowa Code section 622.10(4)(*a*)(2)(a) indicates production need not occur unless the evidence "is not available from any other source." Not all evidence, however, is equal. And not all evidence saying the same thing has equal

recanted her allegations was sufficient to require production); *People v. McCray*, 958 N.Y.S.2d 511, 518 (App. Div. 2013) (holding production was appropriate where the victim had a history of mental illness, had been the victim of sexual abuse on three prior occasions, and had attempted suicide during the three months preceding trial); *State v. Shiffra*, 499 N.W.2d 719, 724 (Wis. Ct. App. 1993) (holding production was required where a witness's "psychiatric difficulties might affect both her ability to accurately perceive events and her ability to relate the truth"), *abrogated on other grounds by State v. Green*, 646 N.W.2d 298, 309–10 (Wis. 2002) (heightening slightly *Shiffra*'s threshold requirement from a showing that records "may be necessary to a determination of guilt or innocence" to a good faith showing of "a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant"); *see also State v. Middlebrooks*, 840 S.W.2d 317, 333 (Tenn. 1992) (holding that the defendant made a plausible case that records from a psychiatric hospital might be relevant in determining the veracity of a witness's testimony because the records "pertained to the mental instability of a witness that existed within a reasonable time before the testimony was given," but that the district court's error in denying production was harmless in light of the appellate court's review of the records), *superseded by statute on other grounds*, Tenn. Code § 39–13–204(i)(7) (Supp. 1995), *as recognized in State v. Stout*, No. 02C01–9812–CR–00376, 2000 WL 202226, at *27 (Tenn. Crim. App. Feb. 17, 2000). Once again, however, it must be stressed that these cases involve the *production* of documents for *in camera* inspection and not *disclosure* of the documents to the defense.

persuasive power. Thus, when we consider whether information is available from "any other source," particularly in light of the due process concerns present in a criminal defense, we must consider both the content and persuasive power of the evidence. *See Stanaway*, 521 N.W.2d at 577 n.44 (rejecting the notion that evidence is unnecessary because it is cumulative and explaining that cumulative evidence contained in counseling files may be quite probative); *Utah v. Worthen,* 177 P.3d 664, 673 (Utah 2008) (rejecting the belief that cumulative nature of information in mental health record deprives the record of its independent probative value); *State v. Shiffra*, 499 N.W.2d 719, 724 (Wis. Ct. App. 1993) (noting the probability that the quality and probative value of the information in mental health records "may be better than anything that can be gleaned from other sources"), *abrogated on other grounds by Green*, 646 N.W.2d at 309–10.

In considering content and persuasive power, medical or mental health records occupy a special place in the evidentiary pantheon and are generally superior to the recalled memory of an interested witness for multiple reasons. First, jurors tend to believe that which is written over that which is spoken. Richard H. Underwood, *Logic and the Common Law Trial*, 18 Am. J. Trial Advoc. 151, 194 (1996) (citing Irving Younger, *The Art of Cross-Examination* 25 (1976)). Second, the mental health records are contemporaneously generated. *See Jencks v. United States*, 353 U.S. 657, 667, 77 S. Ct. 1007, 1013, 1 L. Ed. 2d 1103, 1111 (1957) ("Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory."). Third, the medical records themselves are usually generated by trained observers who are unbiased regarding the issues in litigation. *Ark. Blue Cross-Blue Shield, Inc. v.*

*Tompkins*, 507 S.W.2d 509, 512 (Ark. 1974) (citing expert testimony that "it is traditional in medicine that the medical record is the key to what is happening to the patient and that great stock is placed in that record as truly and clearly reflecting what happens to the patient as to the care being given").    Fourth, medical records frequently contain information unknown to the patient, including detailed diagnoses, comments regarding causation, and observations regarding a patient's appearance and demeanor, which may be relevant in a given case.    *See, e.g., Prymer v. Astrue*, No. 10 C 50311, 2012 WL 3988331, at *5 (N.D. Ill. Sept. 10, 2012) (unpublished opinion) (noting the record indicates a claimant for supplemental security income benefits and disability insurance benefits was cognitively intact upon examination following a motor vehicle accident); *Hambrick v. Astrue*, No. 09–CV–689–PJC, 2011 WL 651408, at *1 (N.D. Okla. Feb. 11, 2011) (unpublished opinion) (indicating the patient testified he did not remember sniffing paint, which was an incident noted in his medical records).

Any lawyer with practical experience with medical or mental health issues would recognize that a deposition of a patient or a witness is not the equivalent of a review of that person's medical or mental health records.  The caselaw recognizes this as well.  *See State v. Peseti*, 65 P.3d 119, 129–30 (Haw. 2003) (noting animosity may undermine a witness's credibility, and therefore, the exclusion of statements made to a counselor was not harmless error); *In re L.J.P.*, 637 A.2d 532, 537–38 (N.J. Super. Ct. App. Div. 1994) (noting a complaining party's recantation to a state agency's psychologist was more credible than recantations made to family members, which may have been coerced); *Shiffra*, 499 N.W.2d at 724 ("It is also quite probable that the *quality* and probative *value* of the information in the [mental health treatment] reports may be

better than anything that can be gleaned from other sources."); *see also* Fishman, 86 Or. L. Rev. at 50 (calling the requirement that comparable evidence be unavailable from other less intrusive sources "entirely appropriate," but reminding courts to determine whether the "evidence available from less intrusive sources has persuasive power comparable to that in the privileged material"). While it is possible that, in some cases, the specific evidence in a medical record may well provide no additional useful information for the defense, *see State v. Middlebrooks*, 840 S.W.2d 317, 333 (Tenn. 1992) (holding the district court's refusal to order production of privileged records was harmless because the records "had little relevance to [the witness's] credibility or the probative value of his testimony"), *superseded by statute on other grounds,* Tenn. Code § 39–13–204(i)(7) (Supp. 1995), *as recognized in State v. Stout*, No. 02C01–9812–CR–00376, 2000 WL 202226, at \*27 (Tenn. Crim. App. Feb. 17, 2000), in many cases the records will not be useless and will offer evidence of a different content or persuasive quality.

Importantly, however, to the extent evidence might be available to some degree from another source, the decision of whether the other source is comparable to the medical or mental health record simply cannot be made with confidence until the record has been produced and a comparison made between the quality and persuasive power of the record and the other source. With any other approach, the trial court would be conducting a blind and irrational comparison. To use an algebra analogy, one cannot state that X equals Y without knowing something about both X and Y. As stated in the context of executive privilege but applicable here as well: "[A] trial judge cannot accurately evaluate the litigant's showing of necessity without knowing something of the content of the information sought. There is no judicial algebra by

which a court can determine how badly a litigant needs 'X.'" Paul Hardin, III, *Executive Privilege in the Federal Courts*, 71 Yale L.J. 879, 893–94 (1962) (footnote omitted); *accord Stanaway*, 521 N.W.2d at 588 (Boyle, J., concurring). Thus, whether information is not available from any other source cannot ordinarily be determined without production of the mental health records themselves. As a result, all that may be required at the threshold stage is a plausible reason to believe the information—considering its quality and persuasive power—is not available from other sources.

Based on the above analysis and resulting interpretation, I conclude the "information that is not available from any other source" language in section 622.10(4)(*a*)(2)(a) is not facially unconstitutional under the Due Process and Confrontation Clauses of the United States and Iowa Constitutions.

**D. In Camera Inspection.**

1. *Introduction.* The next, and most difficult, issue is the facial constitutionality of the in camera inspection of documents that meet the threshold requirements under the statute. *See* Iowa Code § 622.10(4)(*a*)(2)(b). At first blush, it may seem that in camera inspection by the district court is entirely adequate to satisfy the demands of the due process and confrontation provisions. District court judges are conscientious, they know the law, and they can be expected to apply the law in a dispassionate manner. We trust our judges. We leave the messy fact-bound issues to the sound discretion of the district court. End of story, next case.

But if one looks under the hood of in camera inspection, one finds potential difficulties. The difficulties arise from the lack of focus on the issues the district court is required to consider, the limited perspective of

the district court in considering the relevance of records, the substantial practical problems associated with the in camera inspection and evaluation of mental health records, and the difficulty of preserving meaningful appellate review of district court decisions.

One thing is for sure, however—an uninformed in camera inspection of mental health records will not comport with due process. In other words, the district court must, in some fashion, have at its disposal the tools necessary to conduct a meaningful review and its review must be thorough. Due process does not tolerate shortcuts or guesswork in the production of evidence that may have a bearing on the guilt or innocence of the accused. Further, if in camera inspection is to pass constitutional muster, it will be more time-consuming and, as explained below, will likely to result in more continuances, mistrials, and even reversible error than would result from direct production of records to the parties under court supervision.

2. *Challenges posed by in camera inspection.*

*a. Conflicting roles.* In camera inspection requires that the district court assume uncomfortable roles. First, the court must view the mental health records from the perspective of the defense (who has not seen them) to determine if they contain potentially exculpatory evidence. This may be difficult to do. The judge is not simply evaluating arguments, but is also required to anticipate arguments that might be made by defense counsel. As noted by the Supreme Court in *Dennis*, "[i]n our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." 384 U.S. at 875, 86 S. Ct. at 1851, 16 L. Ed. 2d at 986; *see also Zaal v. State*, 602 A.2d 1247, 1263 (Md. 1992) (citing the value of review by counsel with an advocate's eye).

Second, with the records in hand, the district court now, in addition to being placed in the position of an advocate, simultaneously becomes an arm of the state. The obligation of the state to disclose exculpatory material, of course, does not depend on the presence of a specific request by the defendant. *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490, 505 (1995); *see also United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1984) (opinion of Blackmun, J.); *id.* at 685, 105 S. Ct. at 3385, 87 L. Ed. 2d at 496 (White, J., concurring in part and concurring in judgment); *accord State v. Anderson*, 410 N.W.2d 231, 234 (Iowa 1987). Thus, it is possible that the court is under an obligation to review the file and disclose any exculpatory information even if not requested by the defense. *See Ritchie*, 480 U.S. at 58 n.15, 107 S. Ct. at 1002 n.15, 94 L. Ed. 2d at 58 n.15.[11]

*b. Limited information base and lack of focus.* A district court conducting in camera inspection will necessarily have a limited information base in considering evidentiary matters without briefs from the parties to focus its attention. With respect to evidentiary questions, the law generally gives great emphasis to particularity and focus. The failure to make the right objection, for instance, leads to waiver. We are usually pretty persnickety about this. Evidentiary issues are generally tightly focused on particular pieces of evidence a party seeks to offer.

---

[11]Suppose the defendant makes a plausible case that a witness has a mental illness that affects his ability to perceive events and that, as a result, the mental health records must be produced for in camera inspection. Upon inspection, the district court finds nothing in the mental health records related to the ability of the witness to perceive events, but finds powerful admissions tending to show the defendant did not commit the crime. Such admissions are clearly highly exculpatory, but outside the narrow confines of the request of the defendant. What does the judge do at this stage? Ignore the exculpatory evidence?

In cases under section 622.10(4), however, the defense will not know what is in the records. As a result, sharply focused briefing will be impossible. *See, e.g., Gagne*, 612 A.2d at 901. Further, the district court will not have access to the defense's investigative file and may not be privy to potential strategies available that might be affected by or contingent upon information uncovered in mental health records. As noted in *Dwyer,*

> Despite their best intentions and dedication, trial judges examining records before a trial lack complete information about the facts of a case or a defense to an indictment, and are all too often unable to recognize the significance, or insignificance, of a particular document to a defense.

859 N.E.2d at 418.

The lack-of-focus problem is exacerbated by timing issues. The defense will often seek mental health records as part of pretrial efforts. Timely disclosure may be critical to the development of trial strategy. *See People v. Hammon*, 938 P.2d 986, 994 (Cal. 1997) (Mosk, J., concurring) (noting a defendant often requires advance preparation for the cross-examination of an adverse witness and that "to defend himself meaningfully, he must usually seek out the truth immediately: He cannot wait until the cause is called to trial"). As indicated above, the defendant must make some kind of showing of need for the records, but because the defendant has not seen the records, the defendant's motion will lack the concreteness ordinarily associated with other evidentiary issues. In short, the issues will be "uncrystalized." *Bishop*, 617 N.E.2d at 995.

As a result, review by the district court of mental health records will necessarily be less concrete and at a greater level of abstraction than if the records were available under an appropriate pretrial protective order for review by defense counsel, who would necessarily be better

informed about the factual and legal issues in the case. The lack of concreteness is a problem solely for the defense. As noted by the Supreme Judicial Court of Massachusetts, the lack of concreteness could lead to both overproduction and underproduction of mental health records. *Dwyer*, 859 N.E.2d at 418.

*c. Practical difficulties limiting an informed review—volume and lack of expertise.* The district court may also face practical obstacles in conducting the meaningful review required to comport with due process. The mental health records may be quite voluminous. If so, sensible organization of the material is critical for appropriate review. References abound with instructions for lawyers regarding optimal organization. However, the district court, with its limited resources, may not be in a good position to accomplish preliminary organizational tasks. Further, aside from the voluminous nature of the records, the district court must understand the information they contain. As noted by one authority, "the records may not be arranged in a uniform fashion, abbreviations abound, handwritten comments are often illegible, and procedures will be listed by diagnostic codes." *See* Samuel D. Hodge, Jr., *Unraveling the Mystery of Medical Records*, 52 Prac. Law. 45, 46 (2006).

*People v. McCray*, 958 N.Y.S.2d 511 (App. Div. 2013), provides an example of these potential difficulties. In *McCray*, the trial court had inspected thousands of pages of the victim's mental health records to determine what should be disclosed to the defense. *Id.* at 519. Eventually, the trial court selected twenty-eight pages that it found "pertinent to the case" to disclose to the defense. *Id.* at 518; *id.* at 523 (McCarthy, J., dissenting). The dissenting opinion indicates that, following a thorough review of the documents in the calm setting of appellate chambers, many more documents arguably should have been

disclosed. *Id.* at 523. A bare majority of the five-member appellate court agreed the dissent had unearthed additional documents "relevant to the victim's competence to testify," such as references to the victim's "short-term memory loss," but nonetheless found the district court had not "failed in its diligent efforts to cull through thousands of pages of mental health records to balance the victim's rights against defendant's rights such as would constitute an abuse of discretion." *Id.* at 518–19 (majority opinion). In any event, *McCray* poignantly illustrates the problems associated with burdensome review of voluminous documents by busy trial courts, often in the midst of trial, and subsequent appellate review.

If the district court is to conduct an informed in camera inspection that comports with due process, the district court must get to the bottom of what is actually in the mental health records. A blind review is no review. The district court may be required to arm itself with a medical dictionary, the latest Diagnostic and Statistical Manual of Mental Disorders (DSM), and pharmacology references in order to understand the import of the records. The district court may be required, for instance, to understand the significance of a diagnosis or the impact of prescription drugs on memory, perception, and recall. Even so armed, a district court may not be in a very good position to evaluate mental health records with respect to sophisticated issues such as "suggestibility, undue influence, memory contamination, or source monitoring." 2 Terence W. Campbell & Demosthenes Lorandos, *Cross Examining Experts in the Behavioral Sciences,* § 10:67.l, at 174 (Supp. Sept. 2012) [hereinafter Campbell & Lorandos].

Thus, another practical problem that arises is the district court's lack of expertise in reviewing mental health records. According to a leading treatise, "the judge likely does not have any degree of scientific

training and expertise to determine if a psychological record has information that may prove exculpatory to the defendant." *Id.* § 10:67.l, at 171. For example, in a Georgia case, a defendant in a child molestation case was required to establish in the trial court that records contained exculpatory information without seeing them. *Tidwell v. State*, 701 S.E.2d 920, 922 (Ga. Ct. App. 2010). After in camera inspection, the trial court concluded the records should not be disclosed to the defendant. *Id.* The appellate court noted that " '[a] defendant who challenges a trial court's in camera inspection on appeal must show what information was suppressed and how it is materially exculpatory.' " *Id.* at 923 (quoting *Dodd v. State*, 668 S.E.2d 311, 315 (Ga. App. 2008)). According to the treatise writers, this result is problematic for two reasons, the first of which is that "[t]here is no basis in law or any scientific review of the issue to place any faith in a trial judge's capacity to understand the science involved in issues joined in a child sex case." 2 Campbell & Lorandos § 10:67.1, at 171; *see also* Margaret Bull Kovera & Bradley D. McAuliff, *The Effects of Peer Review and Evidence Quality on Judge Evaluations of Psychological Science: Are Judges Effective Gatekeepers?*, 85 J. Applied Psychology 574, 583 (2000) (finding the scientific training judges receive may be insufficient to help them recognize flaws in psychological research, such as missing control groups and nonblind experimenters). The second reason, according to the treatise authors, is the aforementioned catch-22: "If the defendant has not seen the records, how would they know what information is in them and how it was materially exculpatory?" 2 Campbell & Lorandos § 10:67.1, at 171. Thus, under the Georgia approach, and by implication the approach of other jurisdictions, a defendant seeking mental health records "cannot win for losing." *Id.*

Once the medical information has been sensibly arranged, translated, and generally understood, the next practical concern that arises is careful judicial review. A competent attorney representing an accused would see to it that the mental health records are examined line by line to determine whether the records contain (1) direct evidence related to the crime in question; (2) other evidence related to actual or potential factual issues in the case; and (3) evidence useful for impeachment, including inconsistent statements by a witness or evidence related to the ability of the witness to accurately perceive, comprehend, or recall events. In a voluminous file, the attorney involved would make many judgment calls about the value of the information presented and its potential admissibility. Further, if there is doubt concerning the meaning of a record, counsel may retain the services of experts, such as doctors or nurses, to provide the needed explanations.

In all likelihood, the district court may not be as well situated to examine voluminous mental health records. A district court judge will, no doubt, examine the records line by line, and make a conscientious effort to determine if there is relevant and material evidence, but because of the court's necessarily restricted information base and its lack of experience in comprehensive review of medical records, the review will likely take more time and may be less precise than if conducted by counsel. To the extent the meaning of the records cannot be fully plumbed without outside logistical or expert assistance, the district court could be at a disadvantage compared to an attorney with access to such additional help. And, of course, the examination by the district court will almost certainly be more time-consuming than review by an informed advocate with a clearer eye for germane evidence.

3. *Avoiding constitutional problems with an in camera inspection.* Our desire to avoid the real and substantial problems in camera inspection poses led to our approach in *Cashen.* There are several interpretive and procedural approaches available, however, that might be employed to address the potential difficulties.

*a. Anticipatory briefing by the parties.* To a certain extent, the parties may mitigate the problems of in camera inspection by presenting meaningful briefing that anticipates the difficulties the district court is likely to face. For example, the district court's lack of medical expertise may be remedied by attaching appropriate materials, such as an expert's affidavit indicating the potential relevance of possible discoveries in the medical records, pages from the DSM, or other source material likely to be helpful to the district court. The parties, however, will still be unable to fully assist the court because of the lack of knowledge regarding the actual contents of the records. Any anticipatory submissions will necessarily still retain a cart-before-the-horse flavor, but well-prepared counsel should be able, at least to some extent, to anticipate the tools the district court might need for effective in camera inspection.

*b. Request for supplemental submissions.* The district court should never engage in uninformed review of mental health records. The problem, of course, is one of knowing what one does not know. Production of documents for review by the district court, however, is only an intermediate step. If the district court is unable to determine whether the mental health records contain information that may be germane to the case because of the court's lack of expertise, it may seek the supplemental assistance of the parties. Requests for assistance could be shaped to avoid disclosure of confidential records where possible, but if an informed review by the district court is not possible without some

disclosure, disclosure is necessary to ensure the existence of an informed review. The court can continue to safeguard confidentiality by entering appropriate protective orders. Disclosure to a defense expert under an appropriate protective order, therefore, may be an option to assist the district court in its review.

The notion that in camera inspection may be complemented by other judicially supervised processes is not a stranger to our law. In *State v. Heemstra*, 721 N.W.2d 549, 563 (Iowa 2006), we held that mental health records should be produced for in camera inspection, but that copies should also be made available to counsel under appropriate protective orders to assist the district court in evaluating the contents of the records. Similarly, in *Zaal*, 602 A.2d at 1264, the Maryland Court of Appeals noted that a district court could inspect the documents alone or in the presence of counsel. The bottom line is that if the district court finds itself unable to meaningfully review the mental health records in the context of a particular request, there may be an avenue to obtain the assistance of the parties and protect the constitutional rights of the defendant.

*c. Reasonable interpretation of requests for production.* Because the defense has not had an opportunity to review the requested records prior to the motion for production, district courts should not narrowly interpret such motions. The traditional skeptical judicial eye to evidentiary issues should be replaced by the district court's common-sense understanding of the problems faced by defense counsel seeking production of documents it has not had an opportunity to see. The district court must understand that under the circumstances, the advocacy will be more general, and less precise, than is ordinarily the case. In cases involving close calls, the district court should tilt to the

side of ordering production for in camera inspection. *Green,* 646 N.W.2d at 310.

 *d. Recognition of obligation to revisit preliminary orders.* Any order on a pretrial motion for production or disclosure must be considered preliminary, subject to later review by the court at the request of the defense. This is the teaching of *Ritchie.* *See* 480 U.S. at 59–61, 107 S. Ct. at 1002–03, 94 L. Ed. 2d at 58–60. Once the evidence has been admitted at trial, the district court will be in a better position than it was pretrial to determine the relevancy of any information in mental health records. If the court determines in light of the evidence that disclosure of information in the mental health records is required, the court can order disclosure at that time.

 While rulings after evidence has come in will be better informed, and therefore more accurate, they will necessarily be less timely for the defense. That is the downside inherent in an in camera inspection regime. Once disclosure is made after the receipt of evidence, the defense is entitled to a reasonable period to consider the impact of the evidence and readjust its strategy. Effective cross-examination, however, is not ordinarily developed on the fly. *See State v. Clark,* 814 N.W.2d 551, 568 (Iowa 2012) (Appel, J., dissenting); *see also Hammon,* 938 P.2d at 994 (Mosk, J., concurring); William F. Conour, *Use of Statements in Medical Records in Examining a Witness,* 52 Res Gestae 41, 42 (2009) ("*Before trial,* medical records need to be thoroughly and carefully reviewed by counsel in light of all the anticipated evidence and testimony to determine the possible need for a motion in limine and to outline potential objections at trial." (Emphasis added.)). As noted by one authority, development of effective cross-examination is not an isolated event but must be integrated with the fabric of the trial through "careful

preparation and painstaking effort." John A. Burgess, *Persuasive Cross-Examination*, 59 Am. Jur. Trials 1, § 19 (2013). Great cross-examination is not "ad libbed in the courtroom." *Id.* Further, a denial of effective cross-examination is a " 'constitutional error of the first magnitude.' " *Davis*, 415 U.S. at 318, 94 S. Ct. at 1111–12, 39 L. Ed. 2d at 355 (quoting *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S. Ct. 1245, 1246, 16 L. Ed. 2d 314, 316–17 (1966)). Because of the need for adequate preparation, a continuance or mistrial may be required to allow the parties to adjust their legal posture in light of the new information. By revisiting the issue after the evidence has been received, however, the district court may mitigate the problem caused by the lack of information at the pretrial stage and may be in a position to vindicate due process rights if subsequent events show that the defendant has been deprived of important evidence that might help establish factual innocence.

*e. Entry of appropriate order providing for meaningful appellate review.* In addition, in order to ensure due process, the district court should enter an appropriate order that provides for meaningful appellate review. To do so, the district court should outline the manner in which it reviewed the records, generally outline the factual and legal issues presented in the motion to produce, and provide a sufficient explanation of the court's decision. Where a defendant claims the denial of production violated due process rights, appellate review will be de novo. *See State v. Rainsong*, 807 N.W.2d 283, 286 (Iowa 2011); *Cashen*, 789 N.W.2d at 405.

In addition, if the district court makes a judgment against production of evidence for use at trial, the court may, after ruling, provide sealed copies of the underlying excerpts to counsel for purposes of appeal under appropriate court supervision. *See McGill*, 539 S.E.2d at

In this way, appellate review will be far more meaningful than if the parties and the court were operating on a blind record.

4. *Facial constitutionality of in camera inspection.* Assuming the adoption of the principles discussed above, I conclude the in camera inspection provision of section 622.10(4)(*a*)(2)(b) does not violate the Due Process or Confrontation Clauses of the Iowa or Federal Constitutions. It appears a bare majority of the United States Supreme Court in *Ritchie* approved of the practice. 480 U.S. at 58, 107 S. Ct. at 1002, 94 L. Ed. 2d at 58. Further, while there is authority for the proposition that in camera inspection of mental health records in criminal cases is not adequate under constitutional provisions in other states, *see, e.g., Commonwealth v. Stockhammer,* 570 N.E.2d 992, 1002–03 (Mass. 1991); *Commonwealth v. Lloyd,* 567 A.2d 1357, 1360 (Pa. 1989), most have followed the approach in *Ritchie, see* Fishman, 86 Or. L. Rev. at 29 & n.113.

Our legislature has chosen to provide patients with what it perceives to be greater protection of their privacy rights through the mechanism of in camera inspection. In order to achieve that goal, the legislature has chosen a procedure that shifts the burden of organizing, understanding, and winnowing mental health records from the parties operating under a protective order to the district court in camera.

If the mitigating approaches are implemented as described in this opinion, I am not prepared to conclude the challenged provisions of section 622.10(4)(*a*) violate the Due Process or Confrontation Clauses of the Iowa or Federal Constitutions on their face. In some relatively simple cases, in camera inspection may work quite well. For example, in cases merely showing routine treatment not related in time or substance to events related to the criminal trial, the trial court may readily conclude

that disclosure should not occur. *See, e.g.*, *State v. Howard*, 604 A.2d 1294, 1300 (Conn. 1992) (upholding a district court's decision, after inspecting psychiatric records, that nothing in the records remotely related to the witness's ability to testify or perceive events); *see also State v. Jackson*, 862 A.2d 880, 889 (Conn. App. Ct. 2005) (upholding a trial court's decision to deny the defendant access to records that did "not contain exculpatory or impeachment evidence or evidence relating [to the victim's] ability to comprehend, know and correctly relate the truth"). On the other hand, as noted in *United States v. Lindstrom*, 698 F.2d 1154, 1160 (11th Cir. 1983), certain mental disorders "have a high probative value on the issue of credibility" and should ordinarily be disclosed to the parties. *See also Commonwealth v. Figueroa*, 595 N.E.2d 779, 785 (Mass. 1992) (holding that "where one of the charges is indecent assault and battery on a mentally retarded person, the defense counsel must be entitled to review the records concerning the complaining witness's condition of retardation"). When records show evidence probative of a key witness's ability "to recall, comprehend, and accurately relate the subject matter of the testimony," the mental health privilege will ordinarily give way. *State v. Barroso*, 122 S.W.3d 554, 563 (Ky. 2003); *see also State v. Gonzales*, 912 P.2d 297, 299, 302–03 (N.M. Ct. App. 1996) (holding the district court did not abuse its discretion in ordering production of psychotherapy records for in camera inspection where the defendant showed the complaining witness "had a history of blackouts from alcohol" and had allegedly consumed alcohol and cocaine on the night of the alleged offense). Similarly, where the defense demonstrates that a witness has given inconsistent statements regarding events surrounding the crime, mental health records relating to those events are obviously subject to production. *See Peseti*, 65 P.3d at 129–30.

In more complex cases, however, in camera inspection may not work so well. Determination of whether in camera inspection may be unconstitutional as applied in a given case must await a concrete controversy where the district court declines to provide evidence to the requesting party or where a claim is asserted that the district court engaged in an inadequate or blind review.

5. *Application of principles to this case.* I agree that Neiderbach has met the threshold requirement for in camera inspection. Clearly, he has offered more than a generalized request for records. He has shown that the records may reveal mental health problems that reflect on Jherica's ability to understand or perceive events at about the time of the crime and raise issues regarding her ability to narrate. *See Barroso*, 122 S.W.3d at 562–63; *Gonzales*, 912 P.2d at 302–03. The district court must obtain the documents for in camera inspection.

At this stage of the proceeding, at least, there is no basis for judicial intervention on the ground that a violation of due process as applied has occurred as a result of in camera inspection. Any further challenges must await further proceedings in the district court.

**E. Summary.** Neiderbach has failed to show the challenged provisions of section 622.10(4)(*a*)(2) are facially unconstitutional. The new subsection to section 622.10 is different from the *Cashen* protocol. It will to some extent reduce the number of occasions on which defense counsel obtain access to mental health records. The new subsection also shifts the burden of sifting through evidence to the district court, which may not be in an ideal position to properly evaluate the material. Even though district court judges do the best they can to handle the issues, the shift of the burden may lead to delays, continuances, and even mistrials. There are, however, approaches that district courts may

employ to mitigate the difficulties posed by in camera inspection. Hopefully, the substantive results under the new statute will be the same as under the *Cashen* protocol—namely, that defense counsel will gain the constitutionally-required access to potentially exculpatory evidence contained in mental health records. If this turns out not to be the case, however, there may be occasion to revisit the issues posed in this appeal.[12]

Applying the statute, I conclude that the mental health records sought by Neiderbach in this case should have been produced for in camera inspection.

## II. Admission of Photographic and Video Evidence.

**A. Positions of the Parties.** Neiderbach challenges the admission of a photograph and a video into evidence. The photograph, taken in January 2011, shows E.N. with a tracheal tube and a heat moisture exchanger. The video shows E.N.'s trachea tube being cleaned and suctioned and shows him experiencing several seizures. Neiderbach asserts that the evidence is not relevant to any matter in the case under Iowa Rule of Evidence 5.401. In the alternative, Niederbach asserts that even if the photos are relevant, their probative value was substantially outweighed by the danger of unfair prejudice under Iowa Rule of Evidence 5.403. He claims the exhibits were presented in a way that "maximized [their] theatrical effect and was clearly intended to arouse the jury's sense of horror."

---

[12]Our only recent experience with in camera inspection of mental health records occurred in *State v. Heemstra,* 721 N.W.2d 549 (Iowa 2006). In *Heemstra*, the district court originally engaged in in camera review and determined that no mental health records should be produced to the defendant. *Id.* at 559. On review, we determined the district court should have disclosed the records to the defense under a protective order because the records indicated the victim had an explosive disposition that could have been useful in the defense. *Id.* at 563.

The State responds that the photo and video were relevant to show that E.N. suffered a "serious injury." The State emphasizes the photo and video were not gruesome and not likely to arouse the jury's sense of horror. The State analogizes to cases where autopsy photographs are admissible to illustrate and make understandable the testimony of a pathologist. *See, e.g., State v. Metz*, 636 N.W.2d 94, 99 (Iowa 2001). In any event, the State argues any nonconstitutional error would not entitle Neiderbach to a new trial because, in light of the other evidence of E.N.'s injuries, the admission of the photograph and video did not injuriously affect Neiderbach's rights or create a miscarriage of justice. *See, e.g., State v. Parker*, 747 N.W.2d 196, 209–10 (Iowa 2008).

**B. Discussion.**

1. *Relevance under Iowa Rule of Evidence 5.401.* At the outset, I consider Neiderbach's challenge to the evidence as having no relevance under Iowa Rule of Evidence 5.401. I reject the argument. Under rule 5.401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. The standard for relevance is a relatively low bar, and I find the State jumped the hurdle with respect to the photo and video. Clearly, the photo and the video contained evidence that tended to show E.N. suffered serious injuries.

2. *"Unfair prejudice" under Iowa Rule of Evidence 5.403.* I now consider Neiderbach's more substantial argument that the evidence should have been excluded under Iowa Rule of Evidence 5.403. This rule provides that the district court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 5.403.

In considering the admissibility of evidence under rule 5.403, we must first establish the legal framework. The legal framework was well described in *State v. Cromer,* 765 N.W.2d 1, 8–10 (Iowa 2009). The first question is whether the evidence offered has probative value on an issue in the case. *Id.* at 8. If the evidence has probative value, our next inquiry asks whether admission of the evidence may cause unfair prejudice that substantially outweighs its probative value. *Id.* at 9–10.

On the first question, there is no question that the evidence in the videotape has probative value. Whether E.N. suffered serious injuries as a result of child abuse was an important issue in the litigation. The video demonstrates E.N.'s injuries in a powerful way. It is true that the evidence was to some extent cumulative of expert testimony, but where probative evidence is merely cumulative, the admissibility determination is generally left to the discretion of the district court judge. *State v. Maxwell,* 222 N.W.2d 432, 435 (Iowa 1974). However, the persuasive power of the video is clear. Thus, the video was not merely cumulative, but offered evidence of serious harm to E.N. in a convincing and persuasive fashion. Notably, the defense declined to stipulate to the issue of whether E.N. suffered a serious injury and, as a result, the prosecution was free to prove its case with the available evidence.

Turning to the second inquiry, in *Cromer* we stated " ' "unfair prejudice" . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " 765 N.W.2d at 9 (quoting *Old Chief v. United States,* 519 U.S. 172, 180, 117 S. Ct. 644, 650, 136 L. Ed. 2d 574, 588 (1997)). We also referred to evidence that presents a danger of unfair prejudice as a piece of "unwanted baggage." *Id.* at 9–10. In certain cases, we have upheld a district court's decision to exclude proffered evidence that contained

prejudicial collateral baggage unrelated to the elements of the underlying crime. For instance, we have upheld a district court's decision to exclude evidence of a decedent's state of undress from the waist down at the time of an accident in a case involving our state's dram shop act. *Horak v. Argosy Gaming Co.*, 648 N.W.2d 137, 149 (Iowa 2002). We have also held that a district court should have excluded a police officer's testimony about a defendant's prior arrests and violent tendencies when asked why he patted the defendant down for weapons because the need for such evidence "was very weak in light of the primary issues in the case," "[t]he officer had already testified about two other valid, nonprejudicial reasons . . . for conducting the pat-down," and "evidence of [the defendant's] violent nature could only serve to inflame the passions of the jury." *State v. Martin*, 704 N.W.2d 665, 671–72 (Iowa 2005). In the present case, however, there is no collateral baggage. Rather, the claim is made that the probative evidence was simply too powerful, too emotional-laden, to be admitted under rule 5.403.

We have on occasion held that evidence should be excluded under rule 5.403 where there was not collateral baggage but where the evidence was too confusing or encouraged the jury to make unwarranted assumptions. For example, in *State v. Huston*, 825 N.W.2d 531, 537–38 (Iowa 2013), we held testimony that the department of human services considered a child-abuse report founded should have been excluded because of the danger of unfair influence on the jury. Similarly, in *In re Detention of Stenzel*, 827 N.W.2d 690, 705–08 (Iowa 2013), we held testimony from an expert regarding the process by which the state decides which inmates will become subject to sexually violent predator proceedings should have been excluded under rule 5.403.

There is some authority that photographs of a crime that do not carry collateral baggage may be excluded if they are merely cumulative and quite gruesome. *See, e.g., State v. Poe,* 441 P.2d 512, 514–15 (Utah 1968) (holding the trial court abused its discretion in admitting color slides made during the course of an autopsy depicting the deceased's skull after removal of the brain). *But see State v. Wells,* 603 P.2d 810, 813 (Utah 1979) (rejecting a defendant's contention that photographs of a victim's gunshot wounds should not have been admitted into evidence). Some of our older cases generally seem to reject this approach. *See State v. Hickman,* 337 N.W.2d 512, 515–16 (Iowa 1983) (noting that "[t]rial courts have discretion in determining whether the value of pictures as evidence outweighs their grisly nature" and that "[d]eath pictures are not ordinarily excluded because they are gruesome . . . for murder is by nature a gruesome business."); *accord State v. Seehan,* 258 N.W.2d 374, 378 (Iowa 1977); *State v. Lass,* 228 N.W.2d 758, 771 (Iowa 1975).

In any event, we need not decide whether relevant videos or photographs that do not contain collateral baggage may never be excluded on unfair prejudice grounds solely because of their emotional content. The evidence in this case was powerful, but the power arose from the objective nature of the injuries to the child and was not due to dramatic staging or presentation. The evidence was not gruesome, it was not confusing, and it did not invite unwarranted conclusions. Under the circumstances of this case, I conclude there is not sufficient unfair prejudice to reverse the district court's decision to allow introduction of the evidence.

### III. Issues Related to Expert Testimony.

**A. Positions of the Parties.** Neiderbach challenges the admission of testimony by two prosecution experts regarding evidence

contained in articles published in medical journals. The first expert, Dr. Wilbur Smith, offered testimony about an article recounting the story of a nanny who worked for a physician and admitted to having shaken a baby, thereby producing injuries. The second expert, Dr. Carole Jenny, offered testimony about a study in the journal *Pediatrics* in which twenty-eight persons admitted to shaking babies who were subsequently found to have serious brain injuries.

Neiderbach claims the evidence should have been excluded as hearsay. Neiderbach claims the State did not show the hearsay was within the scope of Iowa Rule of Evidence 5.703, which allows an expert to rely on facts or data if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Neiderbach points to *State v. Barnett*, 445 N.W.2d 749, 752 (Iowa 1989), in which we stated, "The usual facts or data, under the rule, would ordinarily be lab or other test results, charts, texts, etc." Neiderbach asserts that the State failed to meet the foundational requirement of rule 5.703. Even if the State met this requirement, Neiderbach argues, under *C.S.I. Chemical Sales, Inc. v. Mapco Gas Products, Inc.*, 557 N.W.2d 528, 531 (Iowa Ct. App. 1996), the evidence should then "only [be] admitted to explain the basis for the expert opinion," not for its truth.

Neiderbach also contends the admission of the testimony violated the Confrontation Clauses of the State and Federal Constitutions. Neiderbach cites *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S. Ct. 1354, 1365, 158 L. Ed. 2d 177, 194 (2004), for the proposition that the Confrontation Clause of the Federal Constitution bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Neiderbach notes the *Pediatrics* article cited by

Dr. Jenny states with respect to the twenty-eight persons who admitted shaking their babies, " 'No statement was obtained during hospitalization. All confessions came during police custody or judicial investigation, weeks or months after the diagnosis.' " Appellant's Br. 35 (quoting Catherine Adamsbaum et al., *Abusive Head Trauma: Judicial Admissions Highlight Violent and Repetitive Shaking*, 126 Pediatrics 546, 549 (2010)). According to Neiderbach, " '[w]here an expert acts merely as a well-credentialed conduit for testimonial hearsay,' such testimony violates a defendant's right to confrontation." *Id.* at 36 (quoting *United States v. Ramos-Gonzáles*, 664 F.3d 1, 5 (lst Cir. 2011)).

The State, citing Iowa Rule of Evidence 5.703, maintains the experts may rely upon otherwise inadmissible facts or data in arriving at their opinions if such facts or data are derived from sources "reasonably relied upon by experts in the particular field." *See also Brunner v. Brown*, 480 N.W.2d 33, 34–37 (Iowa 1992) (examining rule 5.703). The State maintains that Drs. Smith and Jenny simply relied upon information that was contained in studies published in prestigious medical journals and widely accepted by other physicians. Further, the State argues the evidence may be admitted not for its truth but only to show the basis of the experts' opinions. *See Gacke v. Pork Xtra, L.L.C.,* 684 N.W.2d 168, 183 (Iowa 2004) ("[E]vidence admitted under [rule 5.703] is admitted for the limited purpose of showing the basis for the expert witnesses' opinions; it is not admissible as substantive evidence of the matters asserted therein."). Because the facts and data were not offered for their truth, the State claims, the testimony is not hearsay under Iowa Rule of Evidence 5.801(*c*). With respect to such evidence, according to the State the defendant is entitled to a limiting instruction

(which Neiderbach did not request) but not exclusion. *See Brunner*, 480 N.W.2d at 37.

With respect to the Confrontation Clause claim, the State contends the challenged out-of-court statements were not offered for their truth and are not hearsay. *See Crawford*, 541 U.S. at 59 n.10, 124 S. Ct. at 1369 n.10, 158 L. Ed. 2d at 197–98 n.10 ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). The State cites a leading Iowa treatise, which indicates

> [a] significant number of courts have concluded that expert opinion testimony based on testimonial hearsay does not violate the Confrontation Clause because the expert is available and subject to cross-examination and because the otherwise inadmissible data is offered, not for its truth, but to assist in evaluating the testifying expert's opinion.

7 Laurie Kratky Doré, *Iowa Practice Series*: *Evidence*, § 5.703:4, at 715 (2012).

**B. The Hearsay Rule and its Exceptions.**

1. *Iowa Rule of Evidence 5.703.* Rule 5.703 allows hearsay testimony "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Iowa R. Evid. 5.703. We have emphasized rule 5.703 is "intended to give experts appropriate latitude to conduct their work, not to enable parties to shoehorn otherwise inadmissible evidence into the case." *Stenzel*, 827 N.W.2d at 704. We have held that in order to invoke rule 5.703, the record must show that experts "in 'the particular field' " generally rely on the data in forming their opinions. *Id.* at 706 (quoting Iowa R. Evid. 5.703). It is thus not enough that an individual expert purports to rely upon the data. *Id.* Further, the reliance upon the data must be reasonable. An expert's determination that his reliance is reasonable is

not conclusive, but rather is " 'only one factor in the consideration.' " *Id.* at 706 (quoting *Brunner*, 480 N.W.2d at 35).

2. *Iowa Rule of Evidence 5.803(18).* Iowa Rule of Evidence 5.803(18) allows admission of facts in a learned treatise "[t]o the extent . . . relied upon by [an expert] witness in direct examination, statements contained in published . . . periodicals . . . established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice." The State, however, does not specifically urge the application of this exception on appeal.

There is a body of federal authority under a parallel rule of evidence related to learned treatises. One of the issues in the federal cases is whether testimony about the nature of the periodical generally is sufficient to allow an expert to introduce hearsay under the learned treatise exception. A leading case in this regard is *Meschino v. North American Drager, Inc.*, 841 F.2d 429, 434 (1st Cir. 1988), which stated:

> In these days of quantified research, and pressure to publish, an article does not reach the dignity of a "reliable authority" merely because some editor, even a most reputable one, sees fit to circulate it. Physicians engaged in research may write dozens of papers during a lifetime. Mere publication cannot make them automatically reliable authority. The price of escape from cross-examination is a higher standard than "qualified," set for live witnesses who do not. The words have a serious meaning, such as recognition of the authoritive stature of the writer, or affirmative acceptance of the article itself in the profession.

*See also Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1184 (7th Cir. 1994) ("It is not enough that the journal in which it appeared was reputable; the author of the particular article had to be shown to be an authority before the article could be used consistently with Fed. R. Evid. 803(18)."); *Jacober ex rel. Jacober v. St. Peter's Med. Ctr.*, 608 A.2d 304, 313 (N.J. 1992) ("Mere publication does not

automatically render a text a reliable authority. However, an expert can demonstrate a text's authoritativeness by testifying that professionals in the field regard the text as trustworthy." (Citation omitted.)). *But see Costantino v. Herzog*, 203 F.3d 164, 172 (2d Cir. 2000) ("[G]ood sense would seem to compel recognizing some periodicals—provided there is a basis for doing so—as sufficiently esteemed to justify a presumption in favor of admitting the articles accepted for publication therein.").

The approach of *Meschino* has been endorsed by commentators. For instance, the authors of *The New Wigmore: A Treatise on Evidence: Expert Evidence* note that "[t]he fact that an article was published after editorial peer review in a respected scientific or medical journal is not sufficient to qualify the article as reliable authority." David H. Kaye, David E. Bernstein, & Jennifer L. Mnookin, *The New Wigmore: A Treatise on Evidence: Expert Evidence* § 5.4.2, at 232 (2d ed. 2010) [hereinafter *The New Wigmore*]. Thus, according to the treatise authors, "the ultimate test of whether the article is a reliable authority is not the respectability of the journal, but the authoritativeness of the particular article." *Id.* at § 5.4.2, at 233. As an example of the application of this rule, the treatise cites *Wiggins v. State*, 104 So. 2d 560, 566 (Ala. Ct. App. 1958), where an Alabama court ruled that an article from the *Southern Medical Association Journal* was properly excluded because the proponent offered no evidence that the writing presented "a substantially recognized theory such as might be found in a standard medical book." *See also The New Wigmore* § 5.4.2, at 233; Jack P. Lipton, Maureen O'Connor, & Bruce D. Sales, *Rethinking the Admissibility of Medical Treatises as Evidence*, 17 Am. J.L. & Med. 209, 226 (1991) (noting recent studies indicate the assumption that a medical treatise is trustworthy "may be unjustified").

While there are no Iowa cases on point, federal caselaw suggests that magic words are not required to establish the foundational requirements of the learned treatise exception to the hearsay rule. *Burgess v. Premier Corp.*, 727 F.2d 826, 834 (9th Cir. 1984) (holding the undisputed facts that the author of a treatise was "the preeminent industry expert" and that a company "required its salesmen to read the books and to recommend them to investors" was sufficient to "substantiate the idea that the books were accepted authority"); *Dawson v. Chrysler Corp.*, 630 F.2d 950, 961 (3rd Cir. 1980) (concluding quotations from two reports on automobile crashworthiness prepared for the United States Department of Transportation were admissible under the learned treatise exception where one of the opponent's experts inferentially conceded its authoritativeness and the opponent did not object at the time of trial).

3. *Application of rules to the testimony of Dr. Smith.* The State's expert, Dr. Smith, sought to testify about hearsay statements made by a nanny who apparently admitted to having violently shaken babies who were subsequently found to have injuries. Neiderbach objected on hearsay grounds to the admission of Dr. Smith's testimony related to the nanny's statements. In response, the State elicited testimony from Dr. Smith that the hearsay was contained in a published report in a "good medical journal." The defense at trial countered that the State had not satisfied the learned treatise exception to the hearsay rule, noting that "we don't even know the name of the article or the journal in which it was published." Nonetheless, the court after this record was made overruled the objection.

I conclude the court erred on this record in allowing testimony regarding statements made by the nanny. The State made no effort to

establish that the hearsay was considered reliable in forming opinions by experts in the field under Iowa Rule of Evidence 5.703. *See Stenzel*, 827 N.W.2d at 704. While the State offered some testimony related to the fact that the hearsay was published in "a good medical journal," this is not sufficient to qualify for admissibility under the learned treatise exception. *See Twin City Fire Ins. Co.*, 23 F.3d at 1183; *Meschino*, 841 F.2d at 434. Thus, the State failed to show the article itself was authoritative and was relied upon by experts in the field.

The State argues the hearsay was not, in fact, admitted for the truth of the matter asserted, but rather only to show the basis of the expert's opinion. But even as a basis for the expert's opinion, the evidence must meet the requirements of rule 5.703. Because the testimony of Dr. Smith as it relates to the nanny did not so qualify, his testimony regarding the nanny should not have been admitted.

4. *Application of rules to the testimony of Dr. Jenny.* The State also sought to introduce hearsay through Dr. Jenny regarding the Adamsbaum study, in which twenty-eight persons involved in child-abuse cases confessed to having shaken their children. At trial, the State asked Dr. Jenny whether the Adamsbaum study was published "in journals typically relied on in the medical field." Dr. Jenny responded that the article was published in *Pediatrics*, the journal of the American Academy of Pediatrics, which Dr. Jenny described as "the most prestigious journal in the field of pediatrics." The district court then admitted the evidence over Niederbach's objection.

The admission of this hearsay was also error. The State did not establish that the *facts or data* in the article were the kind of material relied upon by experts in the field under rule 5.703. The same is true regarding any admission of the material under rule 5.803(18). Although

it may be that *Pediatrics* generally is a prestigious journal typically relied upon by experts in the field, the State did not establish that the specific article in the journal was of a type upon which experts in the field ordinarily rely.

5. *Prejudicial error.* As noted in *Stenzel,* we only find reversible error when admission of improper evidence affects a party's substantial rights. 827 N.W.2d at 708. Yet, " '[t]he admission of hearsay evidence is presumed to be prejudical error unless the contrary is affirmatively established.' " *Id.* (quoting *Gacke,* 684 N.W.2d at 183) (internal quotation marks omitted). I conclude on this record that any error in the court's initial ruling was not prejudicial.

**IV. Conclusion.**

For the above reasons, I concur in the result in this case.

Wiggins and Hecht, JJ., join this special concurrence.